**ROSEBROUGH MONUMENT COMPANY, Appellant,**

v.

**MEMORIAL PARK CEMETERY ASSOCIATION, a corporation; Valhalla Cemetery, Crematory and Mausoleum Company, a corporation; Lake Charles Memorial Park, Inc., a corporation; Alexander & Sons, Inc., a corporation, d/b/a Mount Lebanon Cemetery and Mausoleum; Lakewood Park Cemetery, Inc., a corporation; Sunset Burial Park, Inc., a corporation; Stanza & Company, Inc., a corporation, d/b/a Oak Grove Cemetery; Laurel Hill Memorial Gardens, Inc., a corporation; Mason Securities Company, d/b/a Hiram Cemetery; Mount Hope Cemetery and Mausoleum Company, a corporation; Southern Securities Company, a corporation, d/b/a Park Lawn Cemetery, Appellees.**

No. 80–1963.

United States Court of Appeals,
Eighth Circuit.

Submitted June 16, 1981.

Decided Dec. 9, 1981.

Rehearing and Rehearing En Banc Denied Feb. 9, 1982.

Charles Alan Seigel (argued), Stolar, Heitzmann, Eder, Seigel & Harris, Bernard J. Mellman, James L. Zemelman, St. Louis, Mo., for appellants.

John Ashcroft, Atty. Gen., Mary U. Musacchia, Chief Counsel, Antitrust Division, Steven D. Steinhilber, Asst. Atty. Gen., Jefferson City, Mo., for amicus curiae.

Lewis, Rice, Tucker, Allen & Chubb, Biggs, Casserly, Barnes, Fickie & Wolf, Ward Fickie, St. Louis, Mo., for appellees.

Thomas C. Walsh, Dennis E. O'Connell, St. Louis, Mo., for appellee Memorial Park Cemetery Association; Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., of counsel.

Before McMILLIAN and ARNOLD, Circuit Judges, and HANSON,* Senior District Judge.

McMILLIAN, Circuit Judge.

Appellant Rosebrough Monument Co. appeals from a final judgment entered in the District Court for the Eastern District of Missouri denying its claims for treble damages and injunctive relief for antitrust violations. For reversal appellant contends that the district court erred in (1) finding that the cemeteries did not conspire to monopolize the sale, manufacture, installation and maintenance of grave monuments and

---

* The Honorable William C. Hanson, United States Senior District Judge for the Northern and Southern Districts of Iowa, sitting by designation.

markers in the St. Louis metropolitan area; (2) finding that the exclusive foundation preparation policy did not constitute an illegal tying arrangement; and (3) finding that appellant suffered no damages as reflected in a general decline in business and profits. We reverse in part and remand for further proceedings.

Appellant is a privately held Missouri corporation that manufactures and sells burial markers and monuments and performs certain installation services in connection therewith.[1] Each appellee is a Missouri corporation that owns and operates a cemetery in the St. Louis metropolitan area.

For at least twenty years, virtually all of the nearly fifty cemeteries located in the St. Louis metropolitan area have had an agreement which requires the preparation of the foundation for grave monuments or markers be done exclusively by the cemetery that owns the lot. Under the terms of the exclusive foundation preparation policy, independent memorial dealers such as appellant can sell grave markers or monuments to the general public, but only the cemeteries can prepare the foundations for them. Some of the cemeteries allow appellant to place or position its memorials or markers on cemetery-prepared foundations. The cemeteries charge appellant for foundation preparation and appellant must then pass the charge on to the consumer. The cemeteries, however, do not require that a monument or marker be placed on every grave site.

Each cemetery sells markers (and some sell monuments) for installation on its own grounds. Thus, the cemeteries are in competition with appellant and all other monument dealers in the St. Louis metropolitan area for the sale of grave markers and monuments.

Appellant seeks injunctive relief alleging that the exclusive foundation preparation policy constitutes an illegal tying arrangement which restrains competition and ultimately results in a higher price to consumers.

For a tying arrangement to exist, at least two distinct products or services must be sold or leased. The cemeteries generally deny any illegal tying arrangement, arguing that only one product is being sold. All cemeteries operating in Missouri have a perpetual statutory obligation to maintain the appearance of their property. Ten percent of the purchase price of each grave site is paid into a separately managed irrevocable trust fund for the care and upkeep of each cemetery. (Mo.Rev. Stat. §§ 214.270–410 (1978)). As an affirmative defense, appellees justify their exclusive foundation preparation policy on the ground that, as endowed care cemeteries, they are responsible in perpetuity for all grave memorials and frequently have to reset many that have settled or shifted. Thus, according to appellees, the benefit derived by the public because of the exclusive foundation preparation policy outweighs any alleged anticompetitive effect.

Following a bench trial, the district court found in favor of the cemeteries. *Roseborough Monument Co. v. Memorial Park Cemetery Ass'n*, 505 F.Supp. 525 (E.D.Mo. 1980). According to the district court, the transaction involved the sale of just one product as a package deal (cemetery lot, interment, foundation preparation, and installation). The district court held that the exclusive foundation preparation policy was justified by the cemeteries' responsibility to provide perpetual care. The district court failed to find a conspiracy because there was no "conscious parallelism" in price setting for the foundation preparation work. Finally, the district court held that the alleged damages were wholly speculative. This appeal followed.

## I. CONSPIRACY

In its complaint appellant alleges that appellees, individually and through their trade association (Cemetery Manage-

---

1. A monument is a stone memorial or tombstone consisting of two parts, the base and the die which is set upright upon the base. A

marker, on the other hand, is a smaller flat memorial that is frequently made of bronze, copper or some other metal.

ment Association of Greater St. Louis), conspired to restrain interstate commerce unreasonably in violation of § 1 of the Sherman Act.[2] 15 U.S.C. § 1. We agree.

In 1959, the cemetery owners in the St. Louis metropolitan area formed the Cemetery Management Association, a trade association[3] which includes among its membership all appellees except Memorial Park Cemetery. Appellant argues that the trade association was the mechanism by which appellees forestalled competition when it adopted the exclusive foundation preparation policy.

In analyzing whether a trade association agreement restrains competition in the profession, federal courts have most frequently applied the "rule of reason."[4] *National Society of Professional Engineers v. United States,* 435 U.S. 679, 687–92, 98 S.Ct. 1355, 1363–65, 55 L.Ed.2d 637 (1978) (*Professional Engineers*); *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 50, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977) (*Continental T.V.*); *Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918); *Standard Oil Co. v. United States,* 221 U.S. 1, 50–58, 31 S.Ct. 502, 511–15, 55 L.Ed. 619 (1911) (*Standard Oil*); *International Travel Arrangers, Inc. v. Western Airlines, Inc.,* 623 F.2d 1255, 1267 (8th Cir.), *cert. denied,* 449 U.S. 1063, 101 S.Ct. 787, 66 L.Ed.2d 605 (1980); *Sherman v. British Leyland Motors, Ltd.,* 601

F.2d 429, 449–50 (9th Cir. 1979); *Ohio Sealy Mattress Manufacturing Co. v. Sealy, Inc.,* 585 F.2d 821, 831 (7th Cir. 1978), *cert. denied,* 440 U.S. 930, 99 S.Ct. 1267, 59 L.Ed.2d 486 (1979); *Oreck Corp. v. Whirlpool Corp.,* 579 F.2d 126 (2d Cir.) (banc), *cert. denied,* 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978); *Reed Bros. v. Monsanto Co.,* 525 F.2d 486, 499 (8th Cir. 1975), *cert. denied,* 423 U.S. 1055, 96 S.Ct. 787, 46 L.Ed.2d 645 (1976); *Grunin v. International House of Pancakes,* 513 F.2d 114 (8th Cir.), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975); *Worthen Bank & Trust Co. v. National BankAmericard, Inc.,* 485 F.2d 119, 127–28 (8th Cir. 1973), *cert. denied,* 415 U.S. 918, 94 S.Ct. 1417, 39 L.Ed.2d 473 (1974); *Albrecht v. Herald Co.,* 367 F.2d 517, 525 (8th Cir. 1966), *rev'd on other grounds,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968). *See also* Note, *Trade Association Exclusionary Practices: An Affirmative Role for the Rule of Reason,* 66 Colum.L.Rev. 1487, 1502 (1966). The rule, which focuses directly on the challenged restraint's impact on competitive conditions, has been regarded as the standard for testing the enforceability of covenants in restraint of trade which are ancillary to a legitimate transaction. *United States v. Addyston Pipe & Steel Co.,* 85 F. 271, 282–83 (6th Cir. 1898), *modified,* 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899). The rule of reason, with its origins in common law, has given shape to the Sherman Act's broad

---

**2.** 15 U.S.C. § 1 provides in pertinent part:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . .

**3.** A trade association is an organization of producers or distributors of a commodity or service upon a mutual basis for the purpose of promoting the business of their branch of industry and improving their service to the public through the compilation and distribution of information, the establishment of trade standards and the cooperative handling of problems common to the production or distribution of the commodity or service with which they are concerned.

S. Kirsh, Trade Associations, The Legal Aspects 13 (1928) (citation omitted).

**4.** Conspiracies or group boycotts that by agreement or otherwise result in price fixing are *per se* violations of § 1 of the Sherman Act. *United States v. Topco Assocs.,* 405 U.S. 596, 606–09, 92 S.Ct. 1126, 1133–34, 31 L.Ed.2d 515 (1972). The mere exchange of price data and other information among competitors, however, is not *per se* illegal; indeed, such practices can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive. *United States v. United States Gypsum Co.,* 438 U.S. 422, 441 n.16, 98 S.Ct. 2864, 2875 n.16, 57 L.Ed. 854 (1978). Appellant appears to have asked this court to find a *per se* price fixing violation of § 1. We decline its invitation to do so and choose to analyze appellees' exclusive installation policy under the rule of reason. *See* Montague, *"Per Se Illegality" & the Rule of Reason,* in 12 ABA Antitrust Section 69–104 (1958).

pronouncements against agreements that restrain competition. "It has been used to give the Act both flexibility and definition, and its central principle of antitrust analysis has remained constant." *Professional Engineers, supra*, 435 U.S. at 688, 98 S.Ct. at 1363.

 To be successful in its cause of action alleging a conspiracy to unreasonably restrain trade under the rule of reason, appellant must establish: (1) an agreement among two or more persons or distinct business entities, (2) which is intended to harm or unreasonably restrain competition, and (3) which actually causes injury to competition. *See generally Kaplan v. Burroughs Corp.*, 611 F.2d 286, 290–91 (9th Cir. 1979), *cert. denied*, 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980); *Gough v. Rossmoor Corp.*, 585 F.2d 381, 389 (9th Cir. 1978), *cert. denied*, 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979). The primary considerations in determining whether a restraint of trade is unreasonable are whether the intent of the restraint is anticompetitive and whether the restraint itself has significant anticompetitive effects. *See Sherman v. British Leyland Motors, Ltd., supra*, 601 F.2d at 449.

 Simply stated, the inquiry mandated by the rule is whether, on balance, the challenged agreement is one that "merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." *Continental T.V., supra*, 433 U.S. at 49 n.15, 97 S.Ct. at 2557 n.15, *citing Board of Trade v. United States, supra*, 246 U.S. at 238, 38 S.Ct. at 243 (Brandeis, J.). To arrive at a conclusion, the factfinder must weigh all of the circumstances surrounding the agreement (i. e., the market impact, public benefits, economic justifications and competitive effect) before deciding whether the practice should be prohibited as imposing an unreasonable restraint on competition. *Id.* at 49–51, 97 S.Ct. at 2557–58.

 "Contrary to its name, the Rule does not open the field of antitrust inquiry to any argument in favor of a challenged restraint that may fall within the realm of reason. Instead, it focuses directly on the challenged restraint's impact on competitive conditions." *Professional Engineers, supra*, 435 U.S. at 688, 98 S.Ct. at 1363. Agreements among competitors are justified under the rule only when a preponderance of the evidence supports the conclusion that the anticompetitive effect of the agreement is outweighed by the professional and public benefits derived from it.

 As a general rule trade association agreements comport with federal antitrust laws unless they

> [have] not been entered into or performed with the legitimate purpose of reasonably forwarding personal interest and developing trade, but on the contrary were of such a character as to give rise to the inference or presumption that they had been entered into or done with the intent to do wrong to the general public and to limit the right of individuals, thus restraining the free flow of commerce and tending to bring about the evils, such as enhancement of prices, which were considered to be against public policy.

*Standard Oil, supra*, 221 U.S. at 58, 31 S.Ct. at 515; *see also United States v. American Tobacco Co.*, 221 U.S. 106, 179, 31 S.Ct. 632, 648, 55 L.Ed. 663 (1911).

The principal challenge raised by appellant is based upon the Cemetery Management Association's adoption of the exclusive foundation preparation policy. We hold that the exclusive foundation preparation policy stunts rather than develops trade within the cemetery industry and limits consumer choice and the free flow of commerce.

The Cemetery Management Association of Greater St. Louis was started over twenty years ago. According to its bylaws, the Association was formed "for the advancement of management and better cemetery operations in the Greater St. Louis area." (Plaintiff's Ex. 13A). The Association has undertaken numerous efforts to enhance the quality of services provided to the public by their membership. The Association has worked diligently to improve the dura-

bility and handling of vaults and coffin boxes. The Association has also worked to make it easier for heirs of the deceased to transfer ownership or use of cemetery lots. The Association has also adopted policies that legitimately serve its own personal and professional interests. The Association maintains a political action committee that, among other things, solicits and disburses funds for candidates for political offices. The Association also maintains a negotiation committee that deals with labor disputes with the local unions. These activities of the Association are not objectionable and clearly comport with federal antitrust legislation.

As discussed below, however, the exclusive foundation preparation policy has stymied competition in the cemetery industry. The policy has effectively restrained competition among appellees, their coconspirator cemeteries and the other monument manufacturers who wish to perform foundation preparation and placement services. By its own terms, the policy prohibits companies that only manufacture or service memorials from competing with cemeteries for a share of the foundation preparation market. The policy also serves to restrain competition among members of the Association and other cemetery owners. By giving the individual cemetery owners the sole right to prepare the foundation, place, and maintain monuments in their respective cemeteries, a neighboring cemetery that performs the same foundation preparation and placement service at a lower price is foreclosed from competing in the overall foundation preparation and placement market. In sum, the exclusive foundation preparation policy " 'impedes the ordinary give and take of the market place,' and substantially deprives the customer of 'the ability to utilize and compare prices in selecting [foundation preparation and placement] services.' "

Professional Engineers, supra, 435 U.S. at 692–93, 98 S.Ct. at 1365–66 (citing the district court opinion, 404 F.Supp. at 460).

█ The exclusive foundation preparation policy as promoted, adopted and enforced by the members of the Association (Plaintiff's Exhs. 13, 13A) violates the rule of reason because it amounts to an agreement among competitors to reduce or restrain competition. Professional Engineers, supra, 435 U.S. at 696, 98 S.Ct. at 1367; Goldfarb v. Virginia State Bar, 421 U.S. 773, 788–89, 95 S.Ct. 2004, 2013–14, 44 L.Ed.2d 572 (1975); United States v. National Ass'n of Real Estate Boards, 339 U.S. 485, 70 S.Ct. 711, 94 L.Ed. 1007 (1950). Grave memorial companies and neighboring cemeteries should have an equal opportunity to compete in the foundation preparation and placement market with the owner of the cemetery lot. The marketplace, not an intraindustry agreement, should decide who provides the better service. See Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 512–14, 89 S.Ct. 1252, 1263–64, 22 L.Ed.2d 495 (1969) (Fortner I) (White, J.) (summary of evils of tying arrangements). While the policy does not fix prices as such, it operates as an absolute ban on competition concerning the foundation preparation services provided by the cemeteries.[5]

█ It is not necessary to find by direct evidence appellees had a specific unlawful intent to restrain trade in order to establish an unlawful conspiracy under § 1 of the Sherman Act. It is well established that circumstantial evidence may suffice to support an inference that a conspiracy to unreasonably restrain competition exists. Interstate Circuit, Inc. v. United States, 306 U.S. 208, 221–27, 59 S.Ct. 467, 472–74, 83 L.Ed. 610 (1939); Treasure Valley Potato

---

5. Appellees' affirmative defense confirms rather than refutes the anticompetitive purpose and effect of the rule. Appellees argue that the restraint is justified because of their perpetual duty to maintain the appearance of their cemeteries. As the discussion below reveals, no cases have been found that accept such an argument. Infra at pp. 1144–1145. Appellees have not provided ample documentation for their assertion that the individual owner of the cemetery is the only concern that can prepare foundations or install or service grave monuments or markers in such a way that does not destroy the beautiful appearance and tranquil atmosphere of a cemetery's grounds.

*Bargaining Ass'n v. Ore-Ida Foods, Inc.,* 497 F.2d 203, 208 (9th Cir.), *cert. denied,* 419 U.S. 999, 95 S.Ct. 314, 42 L.Ed.2d 273 (1974). When the circumstantial evidence leads to the conclusion that concerted or collaborative action has been contemplated and undertaken by competitors with the purpose and effect of eliminating competition among themselves or from others, a Sherman Act violation has been committed. *United States v. General Motors Corp.,* 384 U.S. 127, 142–43, 86 S.Ct. 1321, 1329, 16 L.Ed.2d 415 (1966); *United States v. Griffith,* 334 U.S. 100, 105, 68 S.Ct. 941, 944, 92 L.Ed. 1236 (1948); *Interstate Circuit, Inc. v. United States, supra,* 306 U.S. at 227, 59 S.Ct. at 474; *Ogilvie v. Fotomat Corp.,* 641 F.2d 581, 587 (8th Cir. 1981); *Admiral Theatre Corp. v. Douglas Theatre Co.,* 585 F.2d 877, 883–84 (8th Cir. 1978) (applying rule of reason analysis); *Arthur Murray, Inc. v. Reserve Plan, Inc.,* 406 F.2d 1138, 1144–45 (8th Cir. 1969); *Union Pacific Coal Co. v. United States,* 173 F. 737, 745 (8th Cir. 1909).

██ Minutes from the Association meetings reflect that the policy was frequently discussed and strongly supported by the Association. Because the anticompetitive effect of the exclusive foundation preparation policy is obvious and outweighs any public benefit or procompetitive effect, we find that an unreasonable restraint on competition was the foreseeable consequence intended by the Association and its membership.

Having found that appellees conspired to unreasonably restrain trade or commerce in violation of § 1 of the Sherman Act,[6] we turn to an examination of the conditions allegedly constituting an illegal tying arrangement.

## II. TYING ARRANGEMENT

██ A tying arrangement is defined as the sale or lease of one item (the tying product) on the condition that the buyer or lessee purchase a second item (the tied product) from the same source. *See Northern Pacific R.R. v. United States,* 356 U.S. 1, 5–6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958) (*Northern Pacific*); *IBM Corp. v. United States,* 298 U.S. 131, 56 S.Ct. 701, 80 L.Ed. 1085 (1936); *Kugler v. AAMCO Automatic Transmissions, Inc.,* 460 F.2d 1214 (8th Cir. 1972); *see also* Turner, *The Validity of Tying Arrangements Under the Antitrust Laws,* 72 Harv.L.Rev. 50 (1958). Tying arrangements deny competitors and consumers free access to the tied product market, not because the seller of the tying product has a superior product in the tied market, but because of the leverage exerted by the seller using the tying product. *Moore v. Jas. H. Matthews & Co.,* 550 F.2d 1207, 1212–15 (9th Cir. 1977) (*Moore*); *see also* 3 P. Areeda & D. Turner, Antitrust Law ¶ 733, at 257–59 (1978) (Areeda Antitrust). Tying sellers, who may hold a legitimate monopoly of the tying product, are often working towards an illegitimate monopoly of the tied product. *See Fortner I, supra,* 394 U.S. at 512–14, 89 S.Ct. at 1263–64.

██ Tying arrangements are presumptively illegal if three elements exist, and once those are demonstrated no specific showing of unreasonable anticompetitive effect is needed. *International Salt Co. v. United States,* 332 U.S. 392, 394–96, 68 S.Ct. 12, 14–15, 92 L.Ed. 20 (1947) (*International Salt Co.*); *Moore, supra,* 550 F.2d at 1212; *Northern v. McGraw-Edison Co.,* 542 F.2d 1336, 1344 (8th Cir. 1976), *cert. denied,* 429 U.S. 1097, 97 S.Ct. 1115, 51 L.Ed.2d 544 (1977). First, there must be two distinct products or services. *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 614, 73 S.Ct. 872, 883, 97 L.Ed. 1277 (1953). Second, the defendant must have sufficient economic power in the tying market to impose significant restrictions in the tied product market. *United States Steel Corp.*

---

6. In adopting the Sherman Act, Congress "intended to exercise its power to the fullest extent under the Commerce Clause." *Chatham Condominium Ass'ns v. Century Village, Inc.,* 597 F.2d 1002, 1006 (5th Cir. 1979); *Joe West-*

*brook, Inc. v. Chrysler Corp.,* 419 F.Supp. 824, 836 (N.D.Ga.1976), *quoting United States v. South-Eastern Underwriters Ass'n,* 322 U.S. 533, 558, 64 S.Ct. 1162, 1176, 88 L.Ed. 1440 (1944).

v. *Fortner Enterprises, Inc.*, 429 U.S. 610, 614–16, 97 S.Ct. 861, 864–65, 51 L.Ed.2d 80 (1977) (*Fortner II*). Finally, the amount of interstate commerce in the tied product market must not be insubstantial. *Northern Pacific, supra*, 356 U.S. at 2, 78 S.Ct. at 516; *Ungar v. Dunkin' Donuts of America, Inc.*, 531 F.2d 1211, 1224 (3d Cir.), *cert. denied*, 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976).

### A. *Two Distinct Products*

Appellant argues that the sale of cemetery lots and the foundation preparation for grave memorials represent two separate and distinct products. While it should be noted that § 3 of the Clayton Act is inapplicable to tie-ins involving services, *Advance Business Systems & Supply Co. v. SCM Corp.*, 415 F.2d 55, 61 (4th Cir. 1969), *cert. denied*, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101 (1970), the installation and maintenance of a product have been found to be subject to the prohibitions against ties under the Sherman Act. *Miller v. Granados*, 529 F.2d 393, 396–97 (5th Cir. 1976) (condominium sale tied to management service contract held to be distinct products and services under § 1 of the Sherman Act).

Appellant asserts that the analysis in *Moore, supra*, 550 F.2d at 1212, 1214–18, is persuasive. We agree. The facts in *Moore* are analogous to those presented, and the conclusion reached by the Ninth Circuit concerning the existence of two distinct products is well reasoned. In *Moore*, the plaintiff, a retailer and installer of grave memorials, commenced a private antitrust action against a group of cemetery owners in Oregon. The cemeteries required that the buyer of a cemetery lot use the installation service of that cemetery. Some of the cemeteries required the buyer of a cemetery lot to purchase a grave marker from or through the cemetery. The plaintiff alleged that the exclusive installation policy represented tying arrangements prohibited under the Sherman Act. The district court entered judgment for all defendants. On appeal, the Ninth Circuit vacated the judg-

ment and remanded the case for further proceedings. *Id.* at 1218. An application of the factors in *Moore* "leads inescapably to the conclusion that separate products and services are involved." *Id.* at 1215.

Separability is based not only upon the physical characteristics of the items involved but also on the business justification for selling the two products. Unless a cost savings results from the tying arrangement or the tied and tying products are typically used as a unit in fixed proportions, the tied product is often regarded as "generically different." *Id.* Appellees have failed to show that the business justifications here result in a cost savings to consumers. *See* text at pp. 1144–1145 *infra*. The evidence tends to show that by entering into the exclusive foundation preparation agreement appellees reduced competition rather than price.

The rules dealing with tie-ins are designed not to prohibit the sale of "physically separable" products or services, but rather to prohibit using a product in strong demand to compel the purchase of a second distinct commodity or service. *Moore, supra*, 550 F.2d at 1214. The public's demand for the ultimate product is often closely related to but legally separable from its demand for the installation of the product. *Id.* The installation of a cable television antenna system has been found to be a separate market from the sale of the components in the antenna system. *United States v. Jerrold Electronics Corp.*, 187 F.Supp. 545, 550–59 (E.D.Pa.1960) (*Jerrold Electronics*), *aff'd*, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961) (per curiam). The installation of avionics equipment has been viewed as separate from the sale of the equipment. *Fontana Aviation, Inc. v. Cessna Aircraft Co.*, 460 F.Supp. 1151, 1154 n.8 (N.D.Ill.1978), *rev'd on other grounds*, 617 F.2d 478 (7th Cir. 1980). Separate markets also exist for the assembly of automobile parts and the servicing and delivery of those parts. *Anderson Foreign Motors, Inc.*

*v. New England Toyota Distributors, Inc.,* 475 F.Supp. 973, 982 (D.Mass.1979).[7]

█ Appellees argue that because no companies in the market area provide foundation preparation services for cemeteries, no separate market for that service exists. Their argument fails because the exclusive foundation preparation policy virtually forecloses the existence of companies which would otherwise solely provide foundation preparation services. Further, a separate demand for a product or service may exist although no commercial entities exist that supply that service. This is especially true where a tying arrangement precludes entrance into the underserved market.

A separate market exists for the preparation of foundations for grave memorials. If given the opportunity to purchase the service separately, consumers would likely be drawn to the company offering foundation preparation services at the least expensive price.

█ Thus, we hold that a cemetery lot and the preparation of the foundation for grave memorials are two generic products. We next inquire whether appellees have sufficient economic power in the tying product market to impose sufficient restrictions in the tied product market.

### B. *Economic Power*

█ Among the factors cited by the Supreme Court that are relevant to our inquiry whether appellees hold sufficient economic power are (1) the unique characteristics of the tying product or its desirability to consumers, (2) the noncompetitive nature of the price sought for the tied product, (3) the volume of sales of the tied product or service (foundation preparation), and (4) the size of the companies owning and operating the tying product (cemetery lots). *See generally* Annot., 51 L.Ed.2d 826 (1978). As to these four elements, the record reflects that appellees possessed sufficient economic power to impose an appreciable restraint on free competition.

█ Monopoly power or dominance in the tying market need not be shown. *Fortner I, supra,* 394 U.S. at 502, 89 S.Ct. at 1258; *Northern v. McGraw-Edison Co., supra,* 542 F.2d at 1347. Sufficient economic power exists if the supplier of the tying product has sufficient leverage in the market to increase prices or to force a significant number of buyers to accept burdensome terms. *Fortner I, supra,* 394 U.S. at 501–03, 89 S.Ct. at 1257–58.

█ It is unnecessary for appellant to prove by voluminous economic data that appellees have a strangle hold on the tying market. *See* Markovits, *Tie-ins, Reciprocity, and the Leverage Theory,* 76 Yale L.J. 1397 (1967). Where the sellers are of sufficient size to exert some power, control or dominance over the tying product, the threshold standard of economic power has been met. *Osborn v. Sinclair Refining Co.,* 286 F.2d 832, 838 (4th Cir. 1960) *(Osborn)* (illegal tying arrangement for supply of oil and machinery), *cert. denied,* 366 U.S. 963, 81 S.Ct. 1924, 6 L.Ed.2d 1255 (1961).

█ Summarizing the case law in the area, we find that in order to answer the question of economic power we look to whether the characteristics of the tying product are unique. For example, the statutory grant of a patent monopoly in *International Salt Co., supra,* 332 U.S. at 395–96, 68 S.Ct. at 14–15, the copyright monopolies in *United States v. Paramount Pictures, Inc.,* 334 U.S. 131, 157–59, 68 S.Ct. 915, 929, 92 L.Ed. 1260 (1948), and *United States v. Loew's, Inc.,* 371 U.S. 38, 49, 83 S.Ct. 97, 104, 9 L.Ed.2d 11 (1962), and the extensive land holding in *Northern Pacific, supra,* 356 U.S. at 8–12, 78 S.Ct. at 519–21, represented tying products that the Court regarded as sufficiently unique to give rise to a presumption of economic power.

Uniqueness alone, however, is not always sufficient to infer economic power. In

---

7. *Cf. Washington Gas Light Co. v. Virginia Elec. & Power Co.,* 438 F.2d 248, 253 (4th Cir. 1971) (where the court held VEPCO's practice of providing homebuilders with inexpensive underground service installations on condition that builders erect a primarily electricity-served home was not an unlawful tie because of the lack of two separate markets).

*Fortner II*, while the evidence showed that the credit terms offered by Fortner were unique because of Fortner's willingness to accept a lesser profit, the Supreme Court held that the unique element did not give rise to an inference of economic power in the tied market. 429 U.S. at 619–21, 97 S.Ct. at 867–68.

*Fortner II*, however, is distinguishable from the case at bar. 429 U.S. at 614–16, 97 S.Ct. at 864–65. Appellants have shown the cemetery owners have an unique economic advantage which enables them to offer a package arrangement for the burial and the supply and installation of the monuments that is significantly differentiated from that which the manufacturer of grave memorials can offer.

It can hardly be denied that cemeteries are distinct enterprises and have a unique public function. *Moore, supra*, 550 F.2d at 1213–16. A cemetery lot, like any piece of real estate, is unique. Further, only a limited number of people have the enormous resources required to start their own cemetery. The capital cost of starting a cemetery is far greater than the cost of manufacturing monuments or markers. Also, zoning restrictions in St. Louis and its neighboring counties make the construction of a new cemetery almost prohibitive. The costs and regulations associated with opening a cemetery prevent appellant from offering the tying product in the unique manner that appellees offer it.

The Supreme Court in several cases has considered the volume of sales in determining whether a particular tying arrangement shows sufficient economic power to establish a violation of § 1 of the Sherman Act. *Fortner II, supra*, 429 U.S. at 616–20, 97 S.Ct. at 865–67; *Northern Pacific, supra*, 356 U.S. at 7–8, 78 S.Ct. at 519; *International Salt Co., supra*, 332 U.S. at 397–98, 68 S.Ct. at 15–16.

In *Standard Oil Co. v. United States*, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949) (*Standard Oil of California*), the Supreme Court held that control of 6.7 percent of the retail gasoline market permitted an inference of substantial economic power. More recently, a 10 percent share of the market has been seen to be sufficient economic power to establish a *prima facie* case. *Cornwell Quality Tools Co. v. C.T.S. Co.*, 446 F.2d 825, 831 (9th Cir. 1971) (*Cornwell Tools*) (exclusive dealing contract with territorial restrictions), *cert. denied*, 404 U.S. 1049, 92 S.Ct. 715, 30 L.Ed.2d 740 (1972); *Osborn, supra*, 286 F.2d at 841.

The case before us falls within the quantitative analysis used in *Standard Oil of California, Osborn* and *Cornwell Tools*. The tying products in the case at bar are the cemetery lots supplied by appellees. Appellees accounted for 22 percent of the burials performed in the market area in 1978, and the exclusive foundation preparation policy, upon which appellant bases its claim, is uniformly followed by nearly all of the cemeteries in St. Louis.

The minimum percentage of market dominance required to establish economic power has never been specified; nevertheless, in deciding this case we need not define in detail the line of demarcation between sufficient and insufficient economic power. It suffices to hold that appellees' level of economic power is sufficient to fall within the broad authority of the Sherman Act.

In sum, appellant has shown that appellees hold a unique economic advantage. The volume of appellees' sales and the size of appellees' enterprises also lead to the conclusion that appellees possess sufficient economic power to impose an appreciable restraint on free competition.

## C. *Interstate Commerce*

In any challenge based upon § 1 of the Sherman Act, the plaintiff must show that the arrangement in question did not have an insubstantial effect upon interstate commerce. *Hospital Building Co. v. Trustees of Rex Hospitals*, 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976); *Burke v. Ford*, 389 U.S. 320, 88 S.Ct. 443, 19 L.Ed.2d 554 (1967); *Harold Friedman, Inc. v. Thorofare Markets, Inc.*, 587 F.2d 127 (3d Cir. 1978); *Taxi Weekly, Inc. v. Metropolitan Taxicab Board of Trade, Inc.*, 539 F.2d 907 (2d Cir.

1976); *Lehrman v. Gulf Oil Corp.*, 464 F.2d 26 (5th Cir.), *cert. denied*, 409 U.S. 1077, 93 S.Ct. 687, 34 L.Ed.2d 665 (1972); *see generally* 1 Areeda Antitrust, *supra*, ¶¶ 231–33; L. Sullivan, Handbook of the Law of Antitrust § 233a (1977).

Appellees contend that their activities are purely local in nature and that if any interstate commerce was affected by the tying arrangement the amount was insignificant. We disagree.

■ Regardless of how local the immediate effect of an activity might be, if the activity has a substantial and adverse effect on interstate commerce, the arrangement falls within the expansive reach of the Sherman Act. *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 195, 95 S.Ct. 392, 398, 42 L.Ed.2d 378 (1974).

The most recent Supreme Court pronouncement of the jurisdictional requirement of interstate commerce under the Sherman Act came in *McLain v. Real Estate Board, Inc.*, 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980) (*McLain*). In *McLain*, the plaintiffs asserted that various real estate brokers, firms, and trade associations had conspired to fix real estate commissions on the sale of residential property in violation of § 1 of the Sherman Act. Both the district court and the Fifth Circuit Court of Appeals found the defendants' activities to be local in nature and without a substantial effect on interstate commerce. In reversing the Fifth Circuit, the Supreme Court held that the plaintiffs could show federal jurisdiction under the Sherman Act by "demonstrat[ing] a substantial effect on interstate commerce generated by respondent's brokerage activity." *Id.* at 242, 100 S.Ct. at 509. The Court concluded that it was unnecessary to make "the more particularized showing of an effect on interstate commerce caused by the alleged conspiracy to fix commission rates, or by those other aspects of [defendants'] activity that are alleged to be unlawful," *id.* at 242–43, 100 S.Ct. at 509, when out-of-state funds, in part, were used to finance the residential properties.

The Supreme Court examines the magnitude of interstate commerce by asking "(1) whether a 'substantial' volume of interstate commerce is involved in the overall ... operation [of cemeteries], and (2) whether the challenged activity is an essential, integral part of the transaction and inseparable from its interstate aspects." *Id.* at 240, 100 S.Ct. at 508 (*citing* the district opinion, 432 F.Supp. at 984, *citing Goldfarb v. Virginia State Bar, supra*, 421 U.S. at 778–85, 95 S.Ct. at 2008–12).

In *Northern v. McGraw-Edison Co.*, this court aggregated the amount of interstate commerce involved for the six-year period during which the defendant had been engaged in the allegedly illegal tie-in practices. 542 F.2d at 1346–48. Applying the aggregation principle to the case at bar, we calculate that since 1972 in excess of twelve thousand persons have purchased both monuments and foundation preparation services from appellees. The volume of business affected by the tying arrangement has been over $4,200,000 during that same period. These figures cannot be said to be insignificant or insubstantial. *See McLain, supra*, 444 U.S. at 241–45, 100 S.Ct. at 508–10; *International Salt Co., supra*, 332 U.S. at 396, 68 S.Ct. at 15.

■ As to the second inquiry, the record establishes that many of the markers or monuments sold by the parties since 1972 were purchased from outside the state of Missouri. The total amount of such purchases was in excess of one million dollars. The purchase of grave markers and monuments is clearly "an integral part" of the transaction; and because of the "inseparability" of the purchase of markers from the overall operation of a cemetery, we hold that the enterprises affected by tying arrangements were within the stream of interstate commerce regulated by the Sherman Act. *McLain, supra*, 444 U.S. at 243, 100 S.Ct. at 509.

■ In addition, in making an inquiry into the effect upon interstate commerce of a tying arrangement, the court can look to the future and reasonably assume that appellees will continue in business for an un-

determined period of time and that business will continue, and possibly increase, in the future. *See Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 338–42, 91 S.Ct. 795, 806–08, 28 L.Ed.2d 77 (1971).

Thus, we hold that the amount of interstate commerce affected by the tie is not insubstantial or *de minimis.* *McLain, supra,* 444 U.S. at 245, 100 S.Ct. at 510; *Fortner I, supra,* 394 U.S. at 501, 89 S.Ct. at 1257; *Moore, supra,* 550 F.2d at 1216.

We have held that (1) appellees have tied two separate and distinct products into a single package, (2) appellees possess sufficient economic power to appreciably restrain competition, and (3) the tying arrangements involve a not insubstantial amount of interstate commerce. Our inquiry does not stop here, however, because we must finally examine whether appellees advance any compelling business justification for their use. *Susser v. Carvel Corp.,* 332 F.2d 505, 519 (2d Cir. 1964), *cert. dismissed,* 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965).

### D. *Justification*

Tying arrangements are valid if they can be shown to protect a legitimate antitrust interest. *See generally* Turner, *The Validity of Tying Arrangements Under the Antitrust Laws, supra,* 72 Harv.L.Rev. at 59; Comment, *Tying Arrangements Under the Antitrust Laws: The "Integrity of the Product" Defense,* 62 Mich.L.Rev. 1413 (1964). To successfully assert this defense appellees must show that (1) there are other public interests that are served by the practice in question; (2) those interests cannot be served by a less restrictive alternative; and (3) the contribution made by the re-

strictive practice is not outweighed by the harm to competition. *See Standard Oil of California, supra,* 337 U.S. at 306, 69 S.Ct. at 1058; *Moore, supra,* 550 F.2d at 1217–18.

Tying arrangements have been justified when a defendant proves that a substitute for the tied product must comply with such precise and detailed specifications that other manufacturers may not be able to market a product functionally compatible with the tying product. *Standard Oil of California, supra,* 337 U.S. at 306, 69 S.Ct. at 1058; *International Salt Co., supra,* 332 U.S. at 397–98, 68 S.Ct. at 15–16. Another justification exists when a small company has been compelled to use tying arrangements to scale high barriers of entry into a new capital intensive market. *Jerrold Electronics, supra,* 187 F.Supp. at 557; *see also Brown Shoe Co. v. United States,* 370 U.S. 294, 330, 82 S.Ct. 1502, 1526, 8 L.Ed.2d 510 (1962).

To justify their tying arrangement appellees argue that all the cemeteries in St. Louis have a perpetual statutory duty to maintain the quality of their lots. Appellees contend that property owners who sell a limited interest in land which they are required to maintain in perpetuity should be able to perform exclusively services incidental to that sale when such services affect its ownership interest and future obligations. We disagree.[8]

There are a number of less onerous methods that appellees can use to protect their legitimate property interest. The record contains evidence that shows the Cemetery Management Association on several occasions discussed preparing quality specification guidelines for foundation preparation and memorial placement. The adoption of quality guidelines in this instance would clearly be in the public interest.

8. In many industries, including cable television, common carrier and condominium industries, owners or licensees retain the obligation to serve all classes of customers with technical integrity and quality service. The cable television operator must give a commitment to provide the community with quality service throughout the life of the franchise. The telephone industry must maintain the integrity of their system, but the FCC has continued to gradually liberalize tariffs on customer install-

ed equipment. *Network Project v. FCC,* 167 U.S.App.D.C. 220, 511 F.2d 786, 797 (1975); *Hush-A-Phone Corp. v. United States,* 99 U.S. App.D.C. 190, 238 F.2d 266, 268 (1956). *See also* Johnson, *Boundaries to Monopoly and Regulation in Modern Telecommunications,* in Communications for Tomorrow 127, 133 (G. Robinson ed. 1978). Thus, the continued obligation to maintain does not, without more, present an ample justification for the existence of a predicate tying arrangement.

We also point out that our decision in favor of multiple entry into the market for foundation preparation and placement of grave markers should not be interpreted as a policy of unlimited or unrestricted open entry. Our aim, as outlined above, is to afford concerns a reasonable opportunity to demonstrate the public advantages in increasing the number of firms that manufacture, prepare foundations, install and service grave markers and foundations. Because a *per se* tying arrangement has been found, appellees have the burden of showing that the system of competition will become unmanageable and that the foundations prepared or markers installed by their private competitors will detract from the appearance or decrease the general services rendered the public. No such showing has been made; thus appellees' justification is unwarranted.

## III. REMEDY

Appellant sought treble damages and injunctive relief in the district court. The burden of proving the legal requisites of such relief was at all times on appellant as the plaintiff below. The district court, after a ten-day trial, found that "[appellant] was not injured by the Rule" (in essence, the tying arrangement), that "[appellant] was not damaged in any amount capable of ascertainment by this Court," and that "[appellant's] evidence of damages was wholly speculative." 505 F.Supp. at 530. We read the district court's opinion as holding that appellant failed to meet the burden of proving the fact of damage as well as the amount of damages. The district court's findings of fact cannot be disturbed on appeal unless "clearly erroneous." *See* Fed.R. Civ.P. 52(a); *e.g., Zenith Radio Corp. v. Hazeltine Research, Inc., supra,* 395 U.S. 100 at 123, 89 S.Ct. 1562 at 1576. With this standard in mind, we now discuss appellant's claims for damages and injunctive relief.

### A. *Damages*

■■■ A plaintiff seeking treble damages under § 4 of the Clayton Act, 15 U.S.C. § 15, must establish an antitrust violation, the fact of damage or injury, a causal relationship between the violation and the injury, and the amount of damages. *See e.g., Paschall v. Kansas City Star Co.,* 605 F.2d 403, 407–08 (8th Cir. 1979); *Admiral Theatre Corp. v. Douglas Theatre Co., supra,* 585 F.2d at 893; *see generally* L. Sullivan, Antitrust § 251 (1977); 15 J. Von Kalinowski, Antitrust Laws and Trade Regulation § 115.02 (1981). Initially one must prove the *fact* of damage "to a reasonable certainty," *Admiral Theatre Corp. v. Douglas Theatre Co., supra,* 585 F.2d at 893, and then prove the *amount* of the damage to the extent that it is "capable of reasonable ascertainment and . . . not . . . speculative or conjectural." *Id.*

"[T]here is a clear distinction between the measure of proof necessary to establish the fact that [appellant] had sustained some damage and the measure of proof necessary to enable the jury to fix the amount." *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931). "[Appellant's] burden of proving the fact of damage under § 4 of the Clayton Act is satisfied by its proof of *some* damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage." *Zenith Radio Corp. v. Hazeltine Research, Inc., supra,* 395 U.S. at 114 n.9, 89 S.Ct. at 1571 n.9.

> Trial and appellate courts alike must also observe the practical limits of the burden of proof which may be demanded of a treble-damage plaintiff who seeks recovery for injuries from a partial or total exclusion from a market; damage issues in these cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts.

*Id.* at 123, 89 S.Ct. at 1576.

■■■ We conclude that the district court's finding that appellant failed to prove the *fact* of damage is clearly erroneous. Appellant's evidence was sufficient to support the inference that appellant had in fact been injured by appellees' exclusive

foundation preparation policy. The tying arrangement employed by appellees effectively excluded appellant from the market for the sale, preparation, and installation of monument foundations.

The district court further found that appellant failed to prove the *amount* of damage. There were three "theories" of recovery submitted to the district court. Theories two and three were dependent on the validity of theory one; thus, only theory one needs to be discussed here. Recovery under theory one was based on the overcharge that appellant allegedly paid appellees for foundation preparation since 1974. Appellant sought to prove that it could have prepared foundations at a lower cost than the price charged by appellees. Thus, appellant sought to measure the damages caused by its exclusion from the foundation preparation market by establishing loss of sales and lost profits.

In an effort to show that it could beat appellees' foundation preparation charges, appellant introduced evidence of numerous time studies of foundation preparation and installations which calculated the costs of labor and materials. Based on these studies, appellant claimed that it could prepare certain foundations and install memorials for under $20 as opposed to the $75 price charged by one of appellees. Tr. at 342. These time studies were attacked by appellees, however, on the basis that appellant failed to take into account the different soil conditions at the various cemeteries, the resulting increases in administrative costs, and the possible need for new equipment and additions to their labor force. Appellees sought to undermine the accuracy and sufficiency of appellant's proof of damages.

Resolution of such conflicts in evidence is properly left to the district court, and here they were resolved in favor of appellees. The district court found that "[c]omparison of [defendants'] charges with plaintiff's incredible estimates and promises [was] meaningless." 505 F.Supp. at 528. The district court further found that "plaintiff was not damaged in any amount capable of ascertainment by this Court" and that

"[p]laintiff's evidence of damages was wholly speculative." *Id.* at 530.

We have reviewed the record and cannot say that the district court's finding that appellant simply failed to satisfy its burden of proof as to the *amount* of damages is clearly erroneous. We therefore affirm the denial of damages. An award of damages may not be based upon mere speculation. However, appellant's evidence was insufficient only as to the measurement of damages. As discussed above, appellant established that it had been excluded from the foundation preparation market by the tying arrangement (the exclusive foundation preparation and installation policy). Under the circumstances, we think an award of nominal damages is justified and remand to the district court with directions to award appellant nominal damages in the amount of $3.

### B. *Injunctive Relief*

The standard for the granting of injunctive relief under § 16 of the Clayton Act, 15 U.S.C. § 26, is somewhat different from the standard for the award of damages. In the injunction context, once a determination has been made that the defendant has violated the antitrust laws, a plaintiff need only demonstrate a "threatened loss or damage" growing out of the violation, 15 U.S.C. § 26. Injunctive relief, therefore, is "available even though the plaintiff has not yet suffered [or proved] actual injury; [the plaintiff] need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." *Zenith Radio Corp. v. Hazeltine Research, Inc., supra*, 395 U.S. at 130, 89 S.Ct. at 1580 (citation omitted). In the case at bar there has been an antitrust violation, and due to the nature of that violation we conclude that appellant is entitled to injunctive relief as a matter of law.

It is beyond cavil that the tying arrangement employed by appellees has had the effect of excluding appellant from the market for the sale, preparation, and installa-

tion of monument foundations. This exclusion of appellant from the market, in our view, represents a "threatened loss or injury" sufficient to require injunctive relief. A similar situation was considered by the Supreme Court in *Zenith Radio Corp. v. Hazeltine Research, Inc.*:

> Judged by the proper standard, the record before us warranted the injunction .... The findings of the District Court were that [the defendants] were conspiring to exclude Zenith and others from the ... market; there was nothing indicating that this clear violation of the antitrust laws had terminated or that *the threat to Zenith inherent in the conduct* would cease in the foreseeable future.

395 U.S. at 131, 89 S.Ct. at 1580 (emphasis added). In the present case the threat inherent in the conduct is even more immediate where, by the very terms of the tying arrangement, appellant is excluded, in fact, from the relevant market. Accordingly, the district court's denial of injunctive relief is reversed, and this portion of the cause is remanded to the district court for formulation of an appropriate order. Appellees, individually or through the Management Association, are free to propose and adopt reasonable rules and guidelines with respect to the foundation preparation and installation of monuments by third parties.

### C. *Attorney's Fees*

Appellant is entitled to reasonable attorney's fees and costs. 15 U.S.C. §§ 15, 26 (as amended in 1976). This matter is remanded to the district court for determination.

Affirmed in part, reversed in part, and remanded with directions.