779 F.2d 444
 54 USLW 2366, 1985-2 Trade Cases 66,886
 MIDWEST COMMUNICATIONS, INC., Appellant,
v.
MINNESOTA TWINS, INC.; Northstar Hockey Partnership;
TwinStar Enterprises, a general partnership; Minnesota
Subscription Television, Inc., d/b/a Spectrum; and Sports
Channel, a Minnesota joint venture, Appellees.
 No. 84-5065.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Feb. 15, 1985.
Decided Dec. 12, 1985.
Rehearing and Rehearing En Banc Denied Jan. 16, 1986.
 
 Leon R. Goodrich, St. Paul, Minn., for appellant.
 Peter S. Hendrixson, Marianne Short, Kevin Rouse, Minneapolis, Minn., for appellees.
 Before ROSS and BOWMAN, Circuit Judges, and SCHATZ,* District Judge.
 BOWMAN, Circuit Judge.
 
 
 1
 Appellant Midwest Communications, Inc. (WCCO) sued the Minnesota Twins (Twins), the Northstar Hockey Partnership (North Stars), TwinStar Enterprises (Twinstar), Minnesota Subscription Television (Spectrum), and Sports Channel for alleged violations of federal and state antitrust laws, breach of contract, and tortious interference with a contract. The case arises from WCCO's unsuccessful bid for telecast rights to Twins and North Stars games, which the Twins and North Stars had agreed to market jointly. In Counts I, II, and III, WCCO asserted that appellees violated the Sherman Act section 1, 15 U.S.C. Sec. 1, by participating in illegal pooling, product tying, and resale price maintenance agreements. WCCO reiterated these allegations in parallel Counts VI, VII, and VIII, claiming that such actions also violated the Minnesota Antitrust Act of 1971, Minn.Stat.Ann. Secs. 325D.49-325D.66 (West 1981). WCCO sought treble damages and injunctive relief under the Clayton Act, sections 4 and 16, 15 U.S.C. Secs. 15 & 26, and under the Minnesota Antitrust Act of 1971, Minn.Stat.Ann. Secs. 325D.57 & 325D.58 (West 1981). In addition, WCCO unsuccessfully sought a temporary restraining order and a preliminary injunction to preclude joint marketing of telecast rights. Midwest Communications, Inc. v. Minnesota Twins, Inc., No. 3-82-1729 (D.Minn. Jan. 19, 1983) (Memorandum and Order denying motion for preliminary injunction).
 
 
 2
 The remaining two counts asserted state law claims concerning a contract between the Twins and Midwest Federal Savings and Loan (Midwest Federal), which is not a party to this action. In Count IV, WCCO contended it had acquired Midwest Federal's contractual right of first refusal for certain pay telecast rights to Twins games. WCCO asserted that the Twins had violated the contract by failing to accept Midwest Federal's offer to buy the pay telecast rights.[1]
 
 
 3
 Appellees denied WCCO's allegations and counterclaimed for intentional interference with contractual relations, intentional interference with prospective business dealings, deliberate injury, and violations of federal and state antitrust laws.
 
 
 4
 Before trial, the District Court[2] dismissed the resale price restriction claim arising under federal antitrust law (Count III). Midwest Communications, Inc. v. Minnesota Twins, Inc., No. 3-82-1729 (D.Minn. June 30, 1983) [hereinafter cited as June 30, 1983 Order]. The court concluded that WCCO did not have standing to pursue the claim because WCCO was not within the target area of the economy endangered by the alleged breakdown of competition due to vertical price restraints. Id. at 4.
 
 
 5
 The case was tried before a jury which, by way of a twenty-nine question special verdict, found that appellees had conspired in violation of the Sherman Act. The jury found that the Twins and North Stars had entered into an unlawful tying arrangement and had injured WCCO by requiring it to purchase the telecast rights of both teams in order to obtain the rights to either team. The jury also found that appellees had conspired to pool telecast rights, but that WCCO had not suffered any injury as a result of the pooling arrangement. In addition, the jury determined that Midwest Federal and the Twins had not intended their contract to be assignable insofar as Midwest Federal's right of first refusal for pay television rights was concerned. The jury found that appellees had not tortiously interfered with the contract between Midwest Federal and the Twins. On appellees' counterclaims, the jury found that WCCO had not intentionally interfered with any of appellees' prospective business dealings or current contractual relations, and also found against appellees on the claims of deliberate injury and violations of federal and state antitrust laws.
 
 
 6
 The District Court entered judgment on the jury verdict for WCCO on its tying claims (Counts II and VII). The court enjoined the Twins and the North Stars from concerted activity to market, sell, or distribute telecast rights for the games of one team on the condition that the purchaser also acquire the telecast rights for the games of the other team. The court also directed the parties to confer and advise the court within ten days about the scheduling of discovery and trial on WCCO's damages with respect to its tying claims. Midwest Communications, Inc. v. Minnesota Twins, Inc., No. 3-83-1729, at 2 (D.Minn. Sept. 13, 1983) [hereinafter cited as September 13, 1983 Order and Memorandum]. Pursuant to the findings of the jury, the District Court dismissed Counts I, IV, V, VI, and VIII, and appellees' counterclaims.
 
 
 7
 In response to the parties' post-trial motions, the District Court reconsidered the judgment and withdrew the order granting the injunction. The court granted appellees' post-trial motion for a judgment notwithstanding the verdict on Counts II and VII, and dismissed those counts with prejudice. The basis for this dismissal was the court's decision that WCCO lacked standing to bring its tying claims. Midwest Communications, Inc. v. Minnesota Twins, Inc., No. 3-82-1729 (D.Minn. Mar. 30, 1984) (Memorandum and Order) [hereinafter cited as March 30, 1984 Memorandum and Order]. Correspondingly, the court denied WCCO's attempts to broaden the scope of injunctive relief through motions for judgment notwithstanding the verdict on Counts I, IV, V, and VI, and for a new trial on several of the special verdict questions.
 
 
 8
 On appeal, WCCO contends that the District Court erred in dismissing its antitrust claims on standing grounds. WCCO attacks the jury's finding that it has not suffered injury from the pooling agreement, and argues that it is entitled to injunctive relief. In addition, WCCO asserts that it is entitled to recover its damages resulting from the tying violation, as well as injunctive relief. Although WCCO initially sought both damages and injunctive relief for the alleged vertical price restrictions, on appeal WCCO is seeking only injunctive relief. Further, WCCO attacks the jury's verdict that Midwest Federal could not assign the right of first refusal for pay telecast rights to Twins games. Finally, WCCO claims that the Twins are estopped from contesting the assignment, an issue that the court, without objection, did not submit to the jury.
 
 
 9
 We affirm the District Court's dismissal of Counts I, II, III, VI, VII, and VIII on the basis that WCCO lacked standing to sue under either federal or state antitrust laws. Because we affirm the District Court's dismissal on standing grounds, we do not consider the merits of the claimed antitrust violations. We also affirm the dismissal of Count IV on the basis of the jury's finding that the contract between Midwest Federal and the Twins was nonassignable. We do not reach the estoppel issue, as it is not properly before us.
 
 I.
 
 10
 We first describe the parties and then sketch the background of the case.
 
 A.
 
 11
 Appellant WCCO is the local CBS network affiliate for the Minneapolis and St. Paul area. Broadcasting by radio since the 1920's and by television since the late 1940's, WCCO carries network shows and creates its own television programs. One of its subsidiaries, Midwest Cable and Satellite, concentrates on developing the pay television market. The WCCO radio station broadcasts the Twins games, while the television station broadcasts various other athletic events.
 
 
 12
 Appellees are closely related sporting and broadcasting organizations. The Twins are a professional, major-league baseball team headquartered in Minneapolis. The North Stars are a professional, major-league hockey team that plays its home games in Bloomington, Minnesota. Spectrum is a pay television company serving the Minneapolis and St. Paul area. Subscribers pay a monthly fee for a decoding device that unscrambles the signal that Spectrum broadcasts through the air. After agreeing to Spectrum's offer to telecast their games, the Twins and the North Stars carried out their original plans to create a company--TwinStar--to market and control the broadcast rights of the teams' home and away games. The teams jointly control TwinStar, which holds the exclusive telecast rights for each team's games for twenty years. TwinStar and Spectrum then agreed to form Sports Channel, which televises the Twins and North Stars games in metropolitan Minneapolis and St. Paul. Sports Channel televised its first game, featuring the North Stars, in November 1982.
 
 B.
 
 13
 Midwest Federal began buying the broadcast rights to Twins games in 1971, and sublicensed the television rights to a local television station and the radio rights to WCCO's radio station. In January 1980, the Twins agreed to sell Midwest Federal the exclusive television and radio broadcast rights to certain Twins games for five years. While the television rights were limited primarily to away games, the radio rights encompassed the entire regular season, both home and away games. In addition, the agreement gave Midwest Federal the right of first refusal with respect to buying the pay television rights to Twins games.[3]
 
 
 14
 In 1981, the North Stars began exploring the pay television market as a means of increasing their income by expanding the number of games broadcast without jeopardizing their ticket sales at home games. At that time, a local television station televised the North Stars' away games. Following a national pattern in professional sports, the North Stars and the Twins began discussing the possibility of a local, year-around sports channel featuring hockey and baseball. In July 1981, the teams formally agreed to cooperate in developing the then sketchy outlines of a company that would market and control their broadcast rights. The Twins, of course, were still bound by their agreement to offer Midwest Federal the right of first refusal should the Twins receive an offer to broadcast their games on pay television.
 
 
 15
 The bidding process began in the spring of 1982 with Movie Systems, Inc., a local company that broadcast recent movies and similar entertainment. After some negotiation, both teams were dissatisfied with the Movie System offer to broadcast their games. Accordingly, the teams began negotiating with Spectrum in the summer of 1982. The negotiations continued until September 1982 when Spectrum made its offer. During this period, the teams also discussed their telecast rights with WCCO, which intended to sell the rights wholesale to cable television system operators in Minneapolis and St. Paul, as well as regionally. WCCO proposed a "Sports Network" partnership covering both teams in a single bid.
 
 
 16
 At least three significant differences existed between WCCO's offer and Spectrum's offer. First, WCCO would sell the broadcast rights wholesale to cable system operators who then would offer their customers a channel featuring Twins and North Stars games. Spectrum planned to sell the telecasts directly to its pay television customers with only a small portion of the sales being wholesale to other pay television system operators. Second, the two approaches potentially could reach different size consumer groups. WCCO's approach could reach only consumers connected to a cable system. Spectrum's scrambled television signal, however, could reach anyone with a decoding devise and a television set. Finally, WCCO's offer encompassed both the metropolitan rights and the regional broadcasting rights. Spectrum's offer extended only to metropolitan Minneapolis and St. Paul; the teams were free to make other arrangements for regional broadcasts of their games.
 
 
 17
 Although the teams informed WCCO that they found its offer inferior to Spectrum's, WCCO refused to alter substantially its original proposal. Consequently, on September 22, 1982, the Twins notified Midwest Federal of Spectrum's offer to purchase the Twins' and the North Stars' pay telecast rights. This notice gave Midwest Federal an opportunity to exercise its contractual right to match Spectrum's bid. Upon request, the Twins provided additional information and granted Midwest Federal a two-week extension (until approximately October 16) in which to decide whether and how to match Spectrum's proposal.
 
 
 18
 On October 14, 1982, Midwest Federal purportedly assigned its rights of first refusal to WCCO. The next day, Midwest Federal submitted an offer to match that of Spectrum. The proposal recommended a joint venture between the Twins and WCCO; it ignored the North Stars.
 
 
 19
 The Twins rejected the Midwest Federal/WCCO offer and assigned their telecast rights to TwinStar, which then formally accepted Spectrum's offer. Under the resulting contract, Spectrum acquired the exclusive rights to the Twins' and North Stars' games for eight years. The agreement allows the teams to participate in setting the prices Spectrum charges both cable television system operators under contract with Spectrum and Spectrum's own subscribers.
 
 II.
 
 20
 The question whether WCCO has standing to assert its antitrust claims has permeated this litigation. In their answers to the original complaint, appellees asserted the affirmative defense that WCCO lacked standing to maintain the action. In a pretrial order concerning WCCO's claim of unlawful resale price maintenance, the District Court found that "WCCO does not have standing to pursue the claims it alleges in Count III because it is not within the area of the economy endangered by the alleged breakdown of competitive conditions within the vertical chain." June 30, 1983 Order, at 3. Granting appellees' post-trial motions, the District Court dismissed the tying claim, and dissolved the injunction it previously had granted, on the basis that WCCO lacked standing to assert the claim. The court concluded that WCCO, as only a potential purchaser, had not suffered a sufficiently direct injury to have standing to sue. March 30, 1984 Memorandum and Order, at 14-15. In rejecting WCCO's post-trial motions with respect to pooling, the District Court relied upon the jury's specific finding that WCCO had not suffered any injury from the pooling agreement. The court observed that absent injury WCCO had no standing to assert its pooling claims. Id. at 16.
 
 
 21
 WCCO argues that the District Court erred in dismissing WCCO's antitrust claims for lack of standing. We disagree.
 
 A.
 
 22
 The question of standing to sue under the Clayton and Sherman Acts is one of law. As the Supreme Court explained in Associated General Contractors v. California State Council of Carpenters, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), antitrust standing requirements go beyond injury in fact; the court must also determine whether the plaintiff, even if injured, is a proper party to bring the action. Id. at 535 n. 31, 103 S.Ct. at 907 n. 31. The federal statutes contain little to guide courts through this narrowing process. Section four of the Clayton Act authorizes private damage suits for violations of federal antitrust laws by persons injured in their "business or property by reason of anything forbidden in the antitrust laws...." 15 U.S.C. Sec. 15.[4] In addition, section sixteen of the Clayton Act also authorizes private suits for injunctive relief "against threatened loss or damage by a violation of the antitrust laws...." 15 U.S.C. Sec. 26.[5] Because the remedies under these two sections are distinct, their standing rules are somewhat different, and we therefore discuss each separately.
 
 B.
 
 23
 Read literally, section four of the Clayton Act confers a right to sue for treble damages upon anyone who claims to have suffered an injury that is causally related to a violation of the antitrust laws. The expansive language in this section makes the statute a potential vehicle for asserting claims based on injuries quite remote from the alleged violation, as long as the plaintiff can show some causal link, however tenuous, between the injury and the violation. The voluminous case law on standing to sue under section four reflects an effort by the federal courts to narrow the scope of the broad statutory language so as to prevent unfair and oppressive results.
 
 
 24
 Although the Supreme Court has developed a multifactor balancing test to determine whether a plaintiff has standing to sue under the antitrust laws,[6] the threshold inquiry must focus on the plaintiff's alleged injury. This inquiry is potentially dispositive: if there is no showing of injury, or if the injury alleged or proven is not an "antitrust injury," the plaintiff does not have a claim cognizable under the antitrust laws.
 
 
 25
 As the Supreme Court has noted repeatedly, Congress enacted the antitrust laws to protect competition, not competitors. Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (citing Brown Shoe Co. v. United States, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962)). Elsewhere, the Supreme Court has emphasized the reasonableness of assuming that Congress "did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages...." Blue Shield v. McCready, 457 U.S. 465, 477, 102 S.Ct. 2540, 2547, 73 L.Ed.2d 149 (1982); see Hawaii v. Standard Oil Co., 405 U.S. 251, 262-63 n. 14, 92 S.Ct. 885, 891 n. 14, 31 L.Ed.2d 184 (1972). In light of these controlling principles, the Supreme Court defined an antitrust injury as one that
 
 
 26
 the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations ... would be likely to cause."
 
 
 27
 Brunswick, 429 U.S. at 489, 97 S.Ct. at 697 (citation omitted). The Supreme Court later drew upon this language in stating that an injury that is an integral part of the conspiracy alleged is the type of injury that Congress designed the antitrust laws to prevent. McCready, 457 U.S. at 479, 102 S.Ct. at 2548. In McCready, the Supreme Court found that the plaintiff's injury was "inextricably intertwined with the injury the conspirators sought to inflict" and concluded that the injury fell "squarely within the area of congressional concern." Id. at 484, 102 S.Ct. at 2551 (footnote omitted); see also Associated General Contractors, 459 U.S. at 538, 103 S.Ct. at 908; Razorback Ready Mix Concrete Co. v. Weaver, 761 F.2d 484, 488 (8th Cir.1985); Henke Enterprises v. Hy-Vee Food Stores, Inc., 749 F.2d 488, 489 (8th Cir.1984).
 
 
 28
 We previously have noted that "a mere causal connection between an antitrust violation and harm to plaintiff cannot be the basis for antitrust compensation unless the injury is directly related to the harm the antitrust laws were designed to protect." McDonald v. Johnson & Johnson, 722 F.2d 1370, 1374 (8th Cir.), cert. denied, --- U.S. ----, 105 S.Ct. 219, 83 L.Ed.2d 149 (1984) (citing generally to Brunswick, 429 U.S. 477, 97 S.Ct. 690). To have standing to sue under the antitrust laws, the plaintiff must be the target of the anticompetitive activity, "not one who has merely suffered indirect, secondary, or remote injury...." Midwestern Waffles, Inc. v. Waffle House, Inc., 734 F.2d 705, 710 (11th Cir.1984) (citation omitted); see also Henke Enterprises, 749 F.2d at 489; McDonald, 722 F.2d at 1373-74.
 
 
 29
 The District Court held that WCCO had not suffered an antitrust injury from the alleged tying of the Twins' and the North Stars' telecast rights. Rather, the court characterized WCCO's injury as the loss to a competitor of a potential business opportunity to buy the Twins' and North Stars' telecast rights.[7] Moreover, the court ruled that WCCO's alleged injuries are too remote to allow recovery under the antitrust laws. March 30, 1984 Memorandum and Order, at 13. The court also wrote extensively about the difficulties of fashioning a remedy in this case. The court noted that awarding WCCO damages would only create a potentially duplicative and highly speculative remedy. Id. at 13-14. The court concluded that standing must be limited to actual or potential competitors foreclosed from the applicable market and to buyers hurt by the tying arrangement. We agree that WCCO did not fall into either category.
 
 
 30
 In response, WCCO asserts that the District Court overemphasized potential duplicativeness and speculativeness of injury in analyzing proximate causation. According to WCCO, the District Court is obliged to remedy antitrust violations, and WCCO presents the best (and perhaps only) opportunity to remedy the perceived violations in the instant case. WCCO also contends that appellees unlawfully sought to limit the number of broadcasters bidding on the telecast rights. We reject WCCO's assertions and concur with the District Court's analysis.
 
 
 31
 WCCO did fail to gain the sports telecast rights it sought. But, as the District Court concluded, this loss was likely regardless of whether appellees engaged in a tying arrangement. Spectrum simply was willing to pay the teams more for their telecast rights. The causal connection between the alleged antitrust violations and WCCO's asserted injury is tenuous at best. WCCO's loss stemmed from its failure to make the most satisfactory bid--a type of loss that always occurs when a transaction involves multiple bidders.[8] The analogy to Brunswick is striking. In that case, the plaintiffs claimed that their profits would have increased if the defendant had not taken control of several bowling centers to prevent them from closing. Yet, as the Supreme Court noted, the same "loss" would have occurred if another entity had acquired or refinanced the centers. As we do here, the Supreme Court concluded that the loss was not attributable to or caused by an antitrust violation. Brunswick, 429 U.S. at 487-88, 97 S.Ct. at 696-97.
 
 
 32
 With respect to WCCO's pooling claim, the District Court properly rejected WCCO's contention that the court should set aside the jury's verdict that the alleged pooling conspiracy did not injure WCCO. The court concluded that absent a convincing showing of any injury at all, much less an antitrust injury, WCCO had no standing to assert the pooling claim. We agree with the District Court's dismissal of this claim in conformance with the jury verdict.
 
 
 33
 After reviewing the facts of this case in light of the standing prerequisites, we affirm the judgment below that WCCO lacked standing under section four of the Clayton Act to pursue its antitrust claims for treble damages.
 
 C.
 
 34
 Focusing on WCCO's standing to seek injunctive relief on its antitrust claims, WCCO contends that the District Court erred by equating the standing tests under sections four and sixteen of the Clayton Act. We find this argument meritless.
 
 
 35
 Section sixteen involves traditional principles of equity, authorizing relief when the plaintiff demonstrates threatened injury. The remedy "is flexible and capable of nice 'adjustment and reconciliation between the public interest and private needs....' " Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 131, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969) (citation omitted). As one court recently commented, the majority of policy considerations applicable to section four standing analysis also apply to section sixteen standing analysis. Kartell v. Blue Shield, 582 F.Supp. 734, 743 n. 12 (D.Mass.), aff'd in part, rev'd in part, vacated in part, 749 F.2d 922 (1st Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 2040, 85 L.Ed.2d 322 (1985). Here, the District Court clearly indicated that in denying injunctive relief it was applying equitable principles. Moreover, the District Court correctly noted that as to antitrust injury, the rules under section four also apply to actions under section sixteen. See Parks v. Watson, 716 F.2d 646, 662 (9th Cir.1983); Buckley Towers Condominium, Inc. v. Buchwald, 533 F.2d 934, 938 (5th Cir.1976), cert. denied, 429 U.S. 1121, 97 S.Ct. 1157, 51 L.Ed.2d 571 (1977); Kartell, 582 F.Supp. at 743. Cf. Monfort of Colorado, Inc. v. Cargill, Inc., 761 F.2d 570, 573-74 (10th Cir.1985). WCCO thus must demonstrate threatened antitrust injury to receive injunctive relief.
 
 
 36
 The District Court rejected WCCO's request for injunctive relief on the tying claim, finding that WCCO had not shown any actual or threatened antitrust injury. The court also found that WCCO's requested relief would require the dismantling of Spectrum and Sports Channel. The court refused to "allow a private party suffering no actual or impending antitrust injury to obtain such expansive injunctive relief." March 30, 1984 Memorandum and Order, at 15.
 
 
 37
 In arguing its entitlement to injunctive relief on the tying claim, WCCO relies heavily on Rosebrough Monument Co. v. Memorial Park Cemetery Ass'n, 666 F.2d 1130 (8th Cir.1981), cert. denied, 457 U.S. 1111, 102 S.Ct. 2915, 73 L.Ed.2d 1321 (1982). This reliance is misplaced. In Rosebrough, burial marker and monument manufacturers sued several cemeteries alleging that the cemeteries, by requiring burial plot owners to have marker foundations prepared by the cemeteries, fostered an illegal tying arrangement. The Court held that a plaintiff may obtain injunctive relief by showing both a violation of the antitrust laws, and threatened loss or damage attributable to the violation. Id. at 1147. However, an antitrust violation alone is not enough; the plaintiff must also show a threatened antitrust injury. We believe that the District Court correctly concluded that WCCO has not made the requisite showing. Any loss to WCCO, actual or threatened, flows from WCCO's failure to prevail in the competitive bidding for rights to the Twins' and North Stars' games. There is no actual or threatened injury to competition, and thus no antitrust injury.
 
 
 38
 The same conclusion applies to WCCO's pooling claims, where WCCO also failed to show a threatened antitrust injury. The District Court concluded that the jury's failure to find any injury to WCCO confirms the lack of proximate causation between the alleged pooling conspiracy and any threatened injury. Moreover, the court added that WCCO had not objected to the absence of a jury instruction on threatened injury and thus could not raise this issue in a post-trial motion. Fed.R.Civ.P. 51; see DeHues v. Western Electric Co., 710 F.2d 1344, 1346 (8th Cir.1983); Mid-America Food Service v. ARA Services, 578 F.2d 691, 695 (8th Cir.1978). We agree. Although the procedural point is dispositive, we point out that WCCO's asserted threatened injury is nothing more than its asserted actual injury removed to some future date, and since it entails no threatened injury to competition it is not an antitrust injury.
 
 
 39
 WCCO also appeals the District Court's dismissal of the two counts alleging that the teams imposed vertical restrictions on the prices that broadcasters may charge their customers. The District Court found that WCCO had not purchased either team's broadcast rights, was not a cablecaster that had attempted to purchase products or services from Spectrum or Sports Channel, and was not a target of appellees' alleged vertical restraints. The court noted WCCO's failure to allege it was engaged in an economic activity which a prohibition of vertical restraints is intended to protect. In conclusion, the court held that WCCO did not have standing to challenge the alleged vertical price restrictions. We concur: WCCO has not identified any threatened injury to itself, much less an antitrust injury.
 
 D.
 
 40
 Because we conclude that WCCO lacked standing to pursue its federal antitrust claims for either treble damages or injunctive relief, we do not reach the merits of those claims. However, we will comment on our perception of the lack of substance in WCCO's antitrust claims. We have not found in WCCO's allegations any claim of injury to competition in any defined, relevant, product or geographic market. Problems of market definition aside, the level of competition probably increased when Spectrum won its bid for local telecast rights to the Twins' and North Stars' games. Otherwise, if WCCO had prevailed on its initial bid, WCCO would have controlled the Twins' radio broadcast rights, both teams' metropolitan telecast rights, and the regional telecast rights. With Spectrum prevailing, WCCO retained the Twins' radio broadcast rights, Spectrum held the metropolitan telecast rights, and another entity could acquire the unassigned regional telecast rights.[9]
 
 
 41
 We also note in passing the enormous substantive problems with WCCO's tying claim. Chief among these is WCCO's failure to identify the tying product or the tied product. In light of that failure, we have difficulty seeing how the jury could have rationally assessed appellees' economic power in the tying product or the anticompetitive effect, if any, of the alleged unlawful tying arrangement in the market for the tied product. See Rosebrough Monument Co., 666 F.2d at 1140-41. In short, we seriously doubt that WCCO made a sufficient tying case to warrant submission of this claim to the jury. However, because of our affirmance of the District Court's dismissal of WCCO's antitrust claims on the ground that WCCO lacked standing to assert them, we need not explore the substantive merits of any of those claims.
 
 III.
 
 42
 In its complaint, WCCO asserted three state antitrust claims under the Minnesota Antitrust Act;[10] these claims parallel the federal claims. Our review of the District Court's orders, memoranda, and opinions, as well as the parties' briefs, indicates that the court and the parties treated the state claims as the equivalent of the federal claims, both substantively and for purposes of standing analysis. With the exception of the original dismissal of Count III, when the District Court dismissed each federal count the parallel state count also fell.[11] Moreover, the jury instructions did not distinguish between federal and state antitrust law.
 
 
 43
 The record presented to this Court does not show that the parties contested this treatment of state law; the parties did not object to the jury instructions and have not raised any issue on appeal regarding possible distinctions between the state and the federal antitrust laws. WCCO has not suggested that the Minnesota courts would analyze the question of standing under the Minnesota antitrust laws in a manner different from the federal courts' approach to standing in private actions under sections four and sixteen of the Clayton Act. Accordingly, we treat the state and federal statutory schemes as equivalent for standing analysis purposes. For the same reasons that we already have held that WCCO lacked standing to pursue its federal antitrust claims, we hold that WCCO lacked standing to pursue its state antitrust claims.
 
 IV.
 
 44
 WCCO contests the jury's verdict that Midwest Federal could not assign its contractual right of first refusal to WCCO. WCCO first contends that a party to a contract may assign all its rights in the contract, including future rights and benefits. According to WCCO, the "plain language" of the agreement unambiguously permitted Midwest Federal to assign its contractual right of first refusal. WCCO alternatively contends that regardless of the validity of the assignment, the Twins are estopped from raising the defense that the assignment was invalid due to their initial acquiescence in the assignment.
 
 
 45
 The agreement between Midwest Federal and the Twins gave Midwest Federal "the right to assign all or any of the radio and television broadcasting rights granted to it" by the agreement.[12] (Emphasis added) On October 14, 1982, Midwest Federal purportedly assigned its right of first refusal of pay television rights to WCCO. See supra note 3.
 
 
 46
 Under Minnesota law, as the District Court correctly noted, the meaning of an ambiguous contract provision presents a question of fact for the jury. Turner v. Alpha Phi Sorority House, 276 N.W.2d 63, 66 (Minn.1979); Westphal v. Anderson, 347 N.W.2d 85, 87 (Minn.App.1984). A contract is ambiguous when it is reasonably susceptible to more than one interpretation or construction. William B. Tanner Co. v. Waseca-Owatonna Broadcasting, 549 F.Supp. 411, 413 (D.Minn.1982). When construing a contract, the fact-finder must allow the parties' intent to prevail. Turner, 276 N.W.2d at 66; Westphal, 347 N.W.2d at 88; Republic National Life Insurance Co. v. Lorraine Realty Corp., 279 N.W.2d 349, 354 (Minn.1979).
 
 
 47
 The District Court's determination of whether an ambiguity exists is a question of law that this Court may review de novo. See Composite Technology, Inc. v. Underwriters at Lloyd's, London, 762 F.2d 708, 710 (8th Cir.1985); Span-Deck, Inc. v. Fab-Con, Inc., 677 F.2d 1237, 1249 (8th Cir.1982), cert. denied, 459 U.S. 981, 103 S.Ct. 318, 74 L.Ed.2d 294 (1982) (citing Republic National Life Insurance, 279 N.W.2d at 354). In the instant case, we have considered this question and are satisfied that the District Court correctly found that the contract was ambiguous concerning assignment of pay television broadcast rights. In light of the ambiguity, the parties were allowed to submit evidence to resolve the ambiguity, and the court submitted the issue of the parties' intent to the jury, directing it to decide whether the contract permitted Midwest Federal to assign the right of first refusal. In the special verdict, question nine, the jury stated its finding that the January 11, 1980 agreement did not permit the assignment between Midwest Federal and WCCO, thus resolving the evidentiary conflict on the issue of the parties' intent in favor of the Twins.
 
 
 48
 In reviewing the District Court's denial of WCCO's motion for judgment notwithstanding the verdict, we consider the evidence in the light most favorable to the Twins, assume that the jury resolved all conflicts of evidence in favor of the Twins, assume as true all facts that the Twins' evidence tended to prove, and give the Twins the benefit of all favorable inferences. We would overrule the District Court only if the evidence is not susceptible of any reasonable inference sustaining the Twins' position. Brown v. Missouri Pacific Railroad, 703 F.2d 1050, 1052 (8th Cir.1983). See also Brown v. Syntex Laboratories, 755 F.2d 668, 671 (8th Cir.1985); DeFranco v. Valley Forge Insurance Co., 754 F.2d 293, 295 (8th Cir.1985). Although the issue of assignability was hotly disputed at trial, there is evidence to support the jury's verdict. The District Court thus was correct in denying WCCO's motion for judgment notwithstanding the verdict.
 
 
 49
 We need not consider WCCO's argument that Midwest Federal assigned not only the right of first refusal but also any causes of action under the contract related to that right. WCCO did not raise this issue before the trial court in its post-trial motions; therefore, the issue is not properly before this court. Singleton v. Wulff, 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976); Spear v. Dayton's, 771 F.2d 1140, 1144 (8th Cir.1985).
 
 
 50
 Finally, WCCO asserts that the Twins are estopped from challenging the assignment because of the Twins' conduct. The conduct alluded to included a conversation between the Twins' lawyer and Midwest Federal's lawyer in which the Twins' lawyer allegedly did not object to the assignment. Furthermore, WCCO argues that the Twins did consider the Midwest Federal/WCCO offer made in competition with Spectrum's proposal without objecting to the parties involved. We do not reach the merits of this claim. As the District Court noted, WCCO did not object to the court's failure to give a jury instruction on the estoppel issue, and so the issue was not submitted to the jury. The District Court was undoubtedly correct in denying WCCO's post-trial motion seeking to resurrect the estoppel issue, and WCCO is barred from raising this issue on appeal. See Fed.R.Civ.P. 51.
 
 V.
 
 51
 For the reasons set forth above, we affirm the judgment of the District Court.
 
 
 
 *
 The HONORABLE ALBERT G. SCHATZ, United States District Judge for the District of Nebraska, sitting by designation. Judge Schatz participated in both the oral argument and the subsequent conference of the three judges. The decision reached by the judges in conference was unanimous. Judge Schatz died on April 30, 1985
 
 
 [1]
 No issues are raised on appeal regarding Count V, in which WCCO claimed that appellees had violated Minnesota tort law by improperly interfering with the exercise of the right of first refusal and by conspiring to reject Midwest Federal's offer
 
 
 [2]
 The Honorable Robert G. Renner, United States District Judge for the District of Minnesota
 
 
 [3]
 The agreement provided that:
 In the event that the Club [Minnesota Twins] receives from another person, firm or corporation a bona fide offer which it is willing to accept (a) for the right to broadcast and televise League Games for either three or five years after 1984, or (b) for the right to broadcast League Games in the State of Minnesota, South Dakota, North Dakota, Wisconsin and/or Iowa during 1983 or 1984 by means of cable, closed circuit, pay or community antenna television, then the Club shall immediately give written notice thereof to the Company [Midwest Federal].... The Company shall have ten (10) days after receipt of said written notice to elect to enter into an agreement with the Club for such broadcast and television rights on the same terms and conditions set forth in such notice.
 Agreement Between the Minnesota Twins, Inc. and Midwest Federal Savings and Loan Association of Minneapolis, p 23, at 21 (Jan. 11, 1980), as reprinted in 1 Joint Appendix to the Parties Briefs, at A-304, A-324, Midwest Communications, Inc. v. Minnesota Twins, Inc., No. 84-5065 (8th Cir.1984) [hereinafter cited as Joint Appendix].
 
 
 [4]
 Section four of the Clayton Act provides that:
 Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may ... recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.
 15 U.S.C. Sec. 15.
 
 
 [5]
 Section sixteen of the Clayton Act provides that:
 Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief ... against threatened loss or damage by a violation of the antitrust laws ... when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings....
 15 U.S.C. Sec. 26.
 
 
 [6]
 The Supreme Court has directed courts to evaluate a series of factors that illuminate the character of the plaintiff's harm, the defendant's alleged wrongdoing, and the relationship between them. Associated General Contractors, 459 U.S. at 538-45, 103 S.Ct. at 908-12. In McDonald v. Johnson & Johnson, this court identified six factors that structure the analysis:
 (1) The causal connection between the alleged antitrust violation and the harm to the plaintiff; (2) Improper motive; (3) Whether the injury was of a type that Congress sought to redress with the antitrust laws; (4) The directness between the injury and the market restraint; (5) The speculative nature of the damages; (6) The risk of duplicate recoveries or complex damage apportionment.
 722 F.2d 1370, 1374 (8th Cir.1983), cert. denied, --- U.S. ----, 105 S.Ct. 219, 83 L.Ed.2d 149 (1984). We most recently reiterated these factors in Henke Enterprises v. Hy-Vee Food Stores, Inc., 749 F.2d 488, 490 (8th Cir.1984). Of course, where the plaintiff has not suffered any antitrust injury, the plaintiff does not have standing to sue under federal antitrust laws. Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977).
 
 
 [7]
 WCCO is a leading competitor in the broadcasting business in the Minneapolis-St. Paul area. It seems quite clear that WCCO's loss of this particular business opportunity did not result in any injury to competition
 
 
 [8]
 A recent case also focused on the bidding process in the context of antitrust injury. In TCI Cablevision, Inc. v. City of Jefferson, 604 F.Supp. 845 (W.D.Mo.1984), the District Court rejected the plaintiff's claims that it had incurred damages by being forced to participate in a bidding process for cable television rights. As we conclude in this case, the TCI Cablevision court concluded that the plaintiff's costs were "too attenuated from the allegedly illegal activity ... to qualify as an actionable 'antitrust injury.' " Id. at 847 (citation omitted). There, interestingly, the plaintiff had been the successful bidder
 
 
 [9]
 The increased numbers of participating broadcasters and games telecast sharply distinguishes this case from National Collegiate Athletic Ass'n v. Board of Regents, 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984). There, the Supreme Court held that the NCAA unreasonably restrained trade by limiting the number of games member institutions could televise. The district court also had found horizontal price fixing. This combination of restraints particularly influenced the Court. Id. 104 S.Ct. at 2962
 
 
 [10]
 In 1982, the relevant time period for this suit, the Minnesota Act stated that "[a]ny person, any governmental body, or the state of Minnesota or any of its subdivisions or agencies, injured by a violation of sections 325D.49 to 325D.66, shall recover three times the actual damages sustained, together with costs and disbursements, including reasonable attorneys' fees." Minn.Stat.Ann. Sec. 325D.57 (West 1981)
 The statute also provided: "In addition to other remedies provided by sections 325D.49 to 325D.66, the courts of this state shall have jurisdiction to grant such temporary, interlocutory, or permanent injunctive relief as is necessary to prevent and restrain violations of sections 325D.49 to 325D.66." Minn.Stat.Ann. Sec. 325D.58 (West 1981).
 
 
 [11]
 Inexplicably, when dismissing Count III, the District Court did not also dismiss the parallel state law count, Count VIII. June 30, 1983 Order. The court, apparently correcting its earlier oversight, dismissed Count VIII in its September 13, 1983 order
 
 
 [12]
 The agreement provided:
 [Midwest Federal] shall have the right to assign all or any of the radio and television broadcasting rights granted to it by the terms of this Agreement to another company or companies operating a radio and television station in Minneapolis, Minnesota, suitable for televising and broadcasting the games covered by the terms of this Agreement....
 Agreement Between the Minnesota Twins, Inc. and Midwest Federal Savings and Loan Association of Minneapolis, p 20, at 20 (Jan. 11, 1980), as reprinted in 1 Joint Appendix, supra, at A-323.