[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

No. 05-15976

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 5, 2006
THOMAS K. KAHN
CLERK

D. C. Docket No. 02-02600 CV-P-E

GULF STATES REORGANIZATION GROUP, INC.

Plaintiff-Appellant,

versus

NUCOR CORPORATION,
CASEY EQUIPMENT CORPORATION,
GADSDEN INDUSTRIAL PARK, LLC,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

**(October 5, 2006)**

Before ANDERSON, BARKETT and CUDAHY,* Circuit Judges.

ANDERSON, Circuit Judge:

_____
        * The Honorable Richard Cudahy, United States Circuit Judge for the Seventh Circuit,
sitting by designation.

## I.   BACKGROUND

This case concerns the Southeastern retail market for hot rolled coil, a type of thin steel used for items such as highway railings and gas canisters.  Appellant Gulf States Reorganization Group ("the Group") challenges Appellees' acquisition of steel mill assets in a bankruptcy auction as a violation of the antitrust laws.  Appellee Nucor is the dominant producer of hot rolled coil for the relevant geographic market, the Southeast United States.

In 1999, Gulf States Steel, Inc. of Alabama ("Gulf States"), a competitor of Appellee, Nucor Corporation, filed for bankruptcy under Chapter 11, which was later converted to a Chapter 7 bankruptcy.  It owned and operated a steel plant in Gadsden, Alabama.   After Gulf States ceased operations, the Group was formed to purchase certain of its assets in the Gadsden mill that could be used to produce hot rolled coil ("the Assets").   In 1999, an independent assessor had put the total market value of the Assets at approximately $19.8 million.   In May 2001, a bankruptcy auction was held and the Assets were unsold because neither the Group nor other potential bidders would meet the reserve price of $7.1 million.

During 2001 and 2002, the Group entered into private negotiations with the Bankruptcy Trustee for the purchase of the Assets.  In 2002, in preparation for these negotiations, the Group determined that the Assets had a value of at least

$13.3 million. In June 2002, the Group offered the Trustee $5 million for the Assets. The bankruptcy court then issued an order saying that the Assets would be sold to the Group unless another party made a higher bid, in which case a a second bankruptcy auction would be held.

This order came to the attention of Appellee Casey Equipment Corporation and Appellee Nucor Corporation. The two companies have a long relationship of buying and selling used steel equipment. They agreed to form a third entity, Appellee Gadsden Industrial Park LLC ("Park") to bid for the Assets and to resell them. Nucor would fund the bid and Casey would manage the sale. Nucor would have an unilateral right to reject any sale of the Assets to domestic purchasers, but a more limited right with respect to foreign ones. They agreed that the highest bid they would make was $8 million.

On September 12, 2002, Park bid $5,250,000 for the Assets, triggering the auction. The Group contacted the Federal Trade Commission about Nucor's involvement but the Commission did not take any action. On September 16, 2002, the bankruptcy auction was held. Prior to the auction, the Group had received $5 million in additional support from the Gadsden Development Authority and $1.5 million from Jefferson Iron & Metal Brokerage, Inc., a scrap dealer. Park's final bid for the Assets was $6.3 million in cash. The Group submitted a part credit/part

3

cash bid of $7 million, even though it had been advised that a credit bid would not be allowed.

The trustee rejected the Group's bid but gave it extra time to make a conforming bid. Although the Group could have made a cash bid of $8.1 million, it did not do so. Thus, Park's bid of $6.3 million was accepted by the bankruptcy trustee. After prevailing, Appellees resold most of the Assets in the Asian market for nearly three times the amount of their successful bid.

On October 23, 2002, the Group sued Appellees in the federal district court for the Northern District of Alabama, alleging violations of Sections 1 and 2 of the Sherman Act. On September 30, 2005, the district court granted Appellees summary judgment on all counts, dismissing the case with prejudice. The Group timely filed an appeal and this case is properly before us.

## II. DISCUSSION

We review a district court's grant of summary judgment de novo. Morris Communications Corp. v. PGA Tour, Inc., 364 F.3d 1288 (11th Cir. 2004).

Before the district court, the Group alleged that the Appellees violated Section 1 of the Sherman Act, prohibiting agreements to restrain trade, and that Nucor violated Section 2 of the Sherman Act, prohibiting monopolization.

4

The district court granted the Appellees summary judgment for three reasons: (1) The Group lacked Article III standing because it did not show that the defendants had caused its injury; (2) the Group lacked "antitrust standing" because it failed to demonstrate "antitrust injury," that is to say injury of the sort that the antitrust laws are meant to redress; and (3) the defendants' actions could not constitute a violation of the antitrust laws because they increased competition in the bankruptcy auction. We conclude that to the contrary, the Group properly demonstrated both causation and antitrust injury and we remand this case to the district court to determine whether the challenged transaction violated the antitrust laws.

A.    The Group Adduced Sufficient Evidence of Causation.

Because the Constitution limits the subject matter jurisdiction of federal courts to cases and controversies, a plaintiff must demonstrate "a causal connection between the injury and the conduct complained of" to have standing in a federal court. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136 (1992). In the instant case, the Group maintains that the injury it suffered was exclusion from the relevant market on account of its failure to purchase the Assets. The conduct complained of is Appellees' arrangement to have Nucor fund Park's bid. The Group alleges that Nucor enjoys a monopoly in the relevant market and

therefore it could not have participated in the auction without violating the antitrust laws.

These assertions state a clear causal connection between the plaintiff's injury and the defendants' conduct. The bankruptcy court had previously told the Group that it could purchase the Assets unless a rival bidder offered a higher cash bid at the bankruptcy auction. At auction, the Appellees offered a higher cash bid. As there were only two bidders in the auction, it is clear that the Group would have purchased the Assets but for the Appellees' participation in the auction.

The district court held otherwise, concluding that the cause was the Group's decision to submit, not a higher cash bid, but instead a non-conforming part credit/part cash bid. However, the mere fact that the Group's own decisions played a role in its failure to win at auction does not obviate the causal connection between the defendants' conduct and the plaintiff's injury. Antitrust law does not require that the defendant be the exclusive cause of the plaintiff's injury but only a "material" one. Cable Holdings of Georgia, Inc. v. Home Video, Inc., 825 F.2d 1559, 1561-62 (11th Cir. 1987) ("To recover under the antitrust laws, a plaintiff must prove that a defendant's illegal conduct materially contributed to his injury.") It is true that the Group could have prevailed had it submitted a higher cash bid. But the Group's need to make a higher bid was occasioned only by the

participation of Nucor.  If Nucor's participation were a violation of the antitrust laws – an issue that we do not decide today –  then it would be improper to regard the Group's injury as entirely self-caused.

Thus, we conclude that the Group has satisfied the causation-in-fact requirement for standing in federal courts.

B.    The Group Has Properly Alleged Antitrust Injury.

In addition to the general standing requirements that apply to all plaintiffs in federal court, plaintiffs challenging violations of the antitrust laws must also show that they have suffered "antitrust injury," or "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Brunswick Corp v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 697 (1977).   That is to say, even assuming that the Appellees did violate the antitrust laws, the Group must still show that its injury due to those violations was the sort that the antitrust laws were intended to prevent.  We conclude that the Group has properly alleged antitrust injury.

We begin our antitrust injury inquiry by characterizing the precise violation asserted by the Group.  We note that while the actual claims in the Complaint are violations of Sections 1 and 2 of the Sherman Act, the allegedly anticompetitive

conduct on which the Group bases its claims is an asset acquisition, thus

implicating Section 7 of the Clayton Act.[1]   Section 7 of the Clayton Act prohibits

corporations from asset acquisitions that will lessen competition or tend to create a

monopoly.  15 U.S.C. § 18.[2]   If an acquisition of assets of a competitor in the

relevant market by a monopolist or dominant firm might otherwise substantially

lessen competition, that acquisition may nonetheless be tolerated under the "failing

company defense," which allows a dominant firm to purchase assets from a

---

[1]      The substance of the issue was litigated below and on appeal and thus is fairly before us.  In any event, even though mergers and asset acquisitions are normally challenged under Section 7 of the Clayton Act, courts have permitted them also to be challenged under Sherman § 2 if they will create or maintain a monopoly.  See, e.g., Fraser v. Major League Soccer, L.L.C., 284 F.3d 47, 61 (1st Cir. 2002) (stating that a"merger to monopoly" can be challenged under Sherman § 2); see also, Golden Grain Macaroni Co. v. F.T.C., 472 F.2d 882, 886-87 (9th Cir. 1972).

[2]      The statute reads in relevant part:

no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another person engaged also in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

15 U.S.C. § 18. The statute defines "person" to include "corporation." 15 U.S.C. § 7.  See also, U.S. v. Von's Grocery Co., 384 U.S. 270, 275, 86 S.Ct. 1478, 1481 (1966) (noting that the Clayton Act was amended to cover asset acquisitions because "corporations [would] merge simply by purchasing their rivals' assets" in order to escape Section 7 of the Clayton Act);  Dr. Pepper/Seven-Up Companies, Inc. v. F.T.C., 991 F.2d 859, 864-66 (D.C. Cir. 1993) (discussing the failing company defense in the context of a soda company's purchase of a bottler's assets in a bankruptcy auction).

competitor that is about to leave the relevant market, as long as there exist no competitively preferable purchasers of those assets. <u>Citizen Publishing Co. v. United States</u>, 394 U.S. 131, 138, 89 S.Ct. 927, 931 (1969); <u>see also</u>, 4 Phillip E. Areeda et al., <u>Antitrust Law</u> ¶ 954 (hereinafter, "Areeda"). If such a purchaser exists, the dominant firm should defer to the preferred purchaser, at least unless the preferred purchaser's bid is "unreasonably low." 4 Areeda ¶ 954(e).

The Group asserts the following: (1) Nucor is by far the dominant producer in the relevant market, enjoying a market share of 85%; (2) the Group wanted to and had the ability both to purchase the Assets and to compete with Nucor in the relevant market; (3) the Assets would constitute substantially all of the assets necessary for a potential entrant into the market to begin operations and compete;[3]

---

[3] Thus, a holding for the Group in this case would not involve a rule of law that a potential antitrust violation exists whenever a dominant firm purchases an isolated piece of commonly available equipment necessary for its ongoing operations that a non-dominant competitor or new entrant had also wanted. <u>See</u> 4 Areeda ¶ 356 (stating that a non-dominant competitor usually cannot challenge a dominant rival's asset acquisition (even if illegal) on the grounds that it would have acquired the asset but for the dominant rival's purchase because ". . . the plaintiff's loss of an opportunity to acquire an asset is not a reason for finding [that acquisition] unlawful.") Such a rule might have anti-competitive effects in the relevant market by inhibiting a dominant firm's access to the inputs markets for equipment necessary to maintain its productive capacity. The antitrust laws allow legal monopolies to compete vigorously on the merits in the relevant market, even if such competition drives out competitors. <u>See</u> <u>United States v. Grinnell</u>, 384 U.S. 563, 570-71, 86 S.Ct. 1698, 1704 (1966) (stating that Sherman Act liability does not extend to firms that become monopolies by virtue of "superior product, business acumen, or historic accident."); <u>Olympia Equipment Leasing Co. v. Western Union Telegraph Co.</u>, 797 F.2d 370, 375 (7th Cir. 1986) (stating that courts recognize that "the lawful monopolist should be free to compete like everyone else; otherwise the antitrust laws would be holding an umbrella over inefficient competitors."); <u>see also</u>, <u>Verizon Communications, Inc. v. Law Offices</u>

(4)  Nucor was thus obliged not to bid against the Group, the preferred purchaser for the Assets; (5) Appellees violated the merger laws by having Nucor participate in the bidding by funding Park's bid; and (6) Appellees' conduct was a proximate cause of the Group's failure to purchase the assets and its exclusion from the relevant market.

The Group contends that, if it can prove these assertions, this would mean that Nucor maintained its purported near-monopoly and denied consumers in the relevant market the benefit of the pressure to lower prices that would likely come about if the Group became a viable competitor, thus substantially lessening competition and violating the antitrust laws.

We decline to address the merits; that is, we decline to address whether the foregoing contentions of the Group would in fact substantially lessen competition in the relevant market and violate the antitrust laws.[4]  However, we conclude that

---

of Curtis V. Trinko, L.L.P., 540 U.S. 398, 415-16, 124 S.Ct. 872, 883 (2004) ("The Sherman Act . . . does not give judges carte blanche to insist that a monopolist alter its way of doing business whenever some other approach might yield greater competition.")  Because a firm's access to inputs is essential to its ability to compete in the relevant market, this means that they must be allowed to compete in the inputs markets associated with the relevant market.

[4]      We decline to address the merits because the district court has not addressed this issue as it is properly framed, and because resolution of the issue will require further development of the record and further fact-finding with respect to whether the challenged acquisition had the effect of substantially lessening competition in the relevant market.  Thus, we vacate the district court's holding on the merits.

the district court erred in concluding that the Group had failed to show antitrust standing.   We conclude that the injury to the Group – its exclusion from the relevant market – is inseparable from the alleged harm to competition.  It is this same exclusion from the market that denies consumers the benefit of the pressure to lower prices that would likely accompany the Group's becoming a viable competitor.[5]   Thus we conclude that the Group has satisfied the requirement of demonstrating antitrust injury, i.e. injury of the type against which the antitrust laws are designed to protect.  See, e.g., Tops Markets, Inc. v. Quality Markets, Inc., 142 F.3d 90 (2d Cir. 1998) (implicitly recognizing antitrust standing of excluded potential competitor); 2 Areeda ¶ 356(a) (stating that while rivals rarely have standing to challenge mergers,  potential competitors can do so when the merger will exclude them from the relevant market and citing Bon-Ton Stores v. May Department Stores Co., 881 F. Supp. 860 (W.D.N.Y. 1994)).

In holding otherwise, the district court emphasized the fact that the bankruptcy auction was governed by full and fair competition.  However, under the merger laws, the propriety of mergers and asset acquisitions is measured by

---

[5]       Unlike the non-dominant competitor who lost the opportunity to purchase an isolated asset and whose injury-in-fact is not an antitrust injury because that injury-in-fact is not the reason for finding the dominant firm's acquisition illegal – as discussed in note 3 supra and in 4 Areeda ¶ 356 – the exclusion of the Group from the market is the reason that Appellees' acquisition may be found to be illegal.

the competitive effects such acquisitions would have in the relevant market, not by the level of competition in the market for the target company or acquisition. For example, a monopolist who purchases a majority share of the stock of one of its competitors cannot defend its merger on the grounds that the shares were publicly traded and open to all.

Because the district court did not properly consider the harm to competition in the relevant market, its reliance on Brunswick is misplaced. In that case, one of the two largest manufacturers of bowling equipment in the United States experienced difficulty (during an economic decline in the industry) in collecting from the many bowling centers still owing Brunswick for bowling equipment supplied. To meet this difficulty, it began acquiring and operating defaulting bowling centers, making it by far the largest operator of bowling centers. Several competing bowling centers filed suit alleging a violation of the antitrust laws because the acquisitions might substantially lessen competition or tend to create a monopoly. However, the injury they suffered, lost profits, was connected to conduct that actually increased competition in the relevant market and thus could not be considered antitrust injury. In contrast, here the Appellees' conduct did not increase competition in the relevant market.

Thus, we conclude that the Group has shown antitrust injury.

12

## III. CONCLUSION

For the foregoing reasons, we reverse the district court's holding with respect to proximate cause and antitrust injury;[6] we vacate the district court's holding with respect to the merits;[7] and we remand for further proceedings not inconsistent with this opinion.

**REVERSED IN PART, VACATED IN PART, and REMANDED.**

---

[6]  We believe that <u>Midwest Communications, Inc. v. Minnesota Twins, Inc.</u>, 779 F.2d 44 (8th Cir. 1985), is distinguishable. That case is similar to the instant case in that both involve antitrust suits by a plaintiff whose bid to purchase assets (TV rights in that case) lost out. The Eighth Circuit indicated that the plaintiff there failed to show either proximate cause or antitrust injury. With respect to proximate cause, the Eighth Circuit held that the causal connection between the alleged illegal tying arrangement and plaintiff's injury was tenuous at best. <u>Id.</u> at 451. Apparently, that was because the winning bid was more advantageous to the defendant seller than the losing bid. <u>See id.</u> at 448-49. In any event, the jury had made a specific finding that the plaintiff had not suffered any injury. <u>Id.</u> at 449. By contrast, in this case, we have held that the Group has shown proximate cause. With respect to antitrust injury, the Eighth Circuit held that the plaintiff was neither an actual or potential competitor who was foreclosed from the market, nor a consumer of the TV service who was hurt by the tying arrangement. <u>See id.</u> at 451. Unlike <u>Midwest</u>, we have held that the Group has shown that Nucor's participation in the auction was causally related to its exclusion from the market, and that this exclusion of a potential competitor from the market was the type of injury which the antitrust laws were intended to prevent.

[7]  Our intention is to express no opinion at all with respect to the merits – i.e., whether the actions of appellees substantially lessened competition in the relevant market and violated the antitrust laws. See note 4, <u>supra</u>. Thus, we express no opinion with respect to the remarks in Judge Cudahy's separate opinion, except to say that we agree with Judge Cudahy that <u>if</u> the Group proves on remand that "Nucor substantially lessened competition in the relevant market" for hot rolled coil, the Group will have proved a violation of the antitrust laws. However, we express no opinion on that issue; we prefer for the district court to conduct the appropriate analysis in the first instance and on a more fully developed record. Nor do we intend to express an opinion on or preempt the district court's discretion with respect to the nature of the appropriate course of action on remand, e.g., immediate trial or further summary judgment proceedings. See Fed.R.Civ.P. 56(d).

No. 05-15976  <u>Gulf States Reorganization Group, Inc. v. Nucor Corp., Casey</u>

<u>Equipment Corp. & Gadsen Industrial Park, LLC</u>

CUDAHY, Circuit Judge, concurring in part and, perhaps, dissenting in part:

This case is about suppression of potential competition by a monopolist–the very essence of anti-competitive conduct. See United States v. El Paso Natural Gas, 376 U.S. 651, 660-62 (1964). I agree with the conclusion of the majority that the allegations here pass both applicable tests of standing. It is not clear to me, however, for what purpose–beyond trial–the matter must be remanded to the district court. In the words of the majority, remand is being ordered to determine "whether the challenged acquisition had the effect of substantially lessening competition in the relevant market" (Majority Op. at 11 n.4), and to determine "whether the challenged transaction violated the antitrust laws" (id. at 5). If this is a remand merely to determine whether the facts conform to the allegations, I have no quarrel with it. However, if there is a suggestion that the allegations might be defective or incomplete, I respectfully disagree.

It has been alleged that by moving to protect its 85 percent market share and hence its effective monopoly, Nucor substantially lessened competition in the relevant market (purportedly the market for hot-rolled coil in the Southeast) and has preserved its power to set prices and control output in that commodity. See United States v. Grinnell Corp., 384 U.S. 563, 571 (1966). It is evident on appeal that these allegations, if proven, will show a violation of the antitrust laws.

15

Whatever may have happened in the auction market for steel-making assets is irrelevant (as the majority seems to agree) and cannot alter the nature of the alleged antitrust violation. I would emphasize that efforts to retain a monopoly by definition harm competition and there is no further need in those circumstances to explore the state of competition. See id. at 576 (recognizing that a firm with monopoly power that acquired potential competitors "perfected the monopoly power to exclude competitors and fix prices"). Consequently, the matter may now proceed to trial.

Although the argument is not relied on by the majority opinion, a major element of Nucor's litigation strategy was the contention that its conduct was excused by its "legitimate business purpose" to make money by trading in steel-making assets. But the concept of a legitimate business purpose as a defense to an allegation of anti-competitive conduct is simply an application of the principle of the rule of reason, which holds that the alleged anti-competitive consequences of a challenged practice may be weighed against its ostensible benefits to competition and to consumers in the larger scheme of things. 7 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1500 (2d ed. 2003 & Supp. 2006). The purpose of this principle is to facilitate and broaden analysis of the impact certain restraints may have on competition in the relevant market and on consumers, not on the

monopolist.  Id. ¶ 1504 ("[T]he rule of reason is not hospitable to every claim within the realm of reason, but only to matters bearing at the competitive significance of a restraint.").  Invoking it here is of no help to Nucor, since the claimed benefits (making money) accrue only to the monopolist, not to consumers. Nucor's purportedly legitimate business reason for entering the auction concerns a separate and unrelated deal in assets, which is of no significance in evaluating the character of its conduct in blocking competition.  Thus, Nucor has acted to prevent a potential competitor from entering the market in which it enjoys a monopoly, ostensibly to make money in a wholly different market.  There is no claim that this alternative activity alters the effect that the primary exercise of monopoly power has on competition or consumers. There is nothing analogous here to the rule of reason, and the purported business purpose is not encompassed by that principle.

The monopolist here has succeeded in converting this rather elementary antitrust case into an argument about the propriety of a bankruptcy auction.  But it matters not at all whether the Group bid at all or how much it bid at the auction. By entering the auction and seeking to buy the assets, Nucor and its co-conspirators allegedly took an action having the effect of excluding the Group from the market and maintaining Nucor's monopoly, which injured the Group and is the source of its damages.  See, e.g., Brunswick Corp. v. Riegel Textile Corp., 752 F.2d 261, 271

17

(7th Cir. 1984) ("Exclusion from a market is a conventional form of antitrust injury that gives rise to a claim for damages as soon as the exclusion occurs . . . .").

I concur in the determination that the Group has standing but respectfully dissent from any suggestion that the district court do more than put the allegations to the proof.