[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-14983
_____

D.C. Docket No. 1:02-cv-02600-RDP

GULF STATES REORGANIZATION
GROUP, INC.,

Plaintiff-Appellant,

versus

NUCOR CORPORATION,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(July 15, 2013)

Before TJOFLAT, CARNES, and JORDAN, Circuit Judges.

JORDAN, Circuit Judge:

Like a swallow returning to Capistrano, this antitrust case is before us again.

In 2006, we ruled that Gulf States Reorganization Group had sufficiently alleged

injury, and reversed the district court's dismissal of its complaint against Nucor Corporation. *See Gulf States Reorganization Group v. Nucor Corp.*, 466 F.3d 961, 967–68 (11th Cir. 2006). In so ruling, we explicitly noted that we were not addressing the merits of GSRG's claims. *See id.* at 967, 968 n.4. On remand, GSRG amended its complaint, abandoning any claim that Nucor was a monopolist.

The claims in the amended complaint—like those in the initial complaint— arose from the purchase, by Nucor and Casey Equipment Company, of the assets of Gulf States Steel in a Chapter 7 bankruptcy liquidation proceeding in Alabama. After discovery, Nucor moved for summary judgment, and, in two reports, a special master recommended that the district court grant Nucor's summary judgment motion. The district court considered GSRG's objections but nonetheless accepted the reports in a published order. *See Gulf States Reorganization Group v. Nucor Corp.*, 822 F. Supp. 2d 1201 (N.D. Ala. 2011).

GSRG now appeals the grant of summary judgment in favor of Nucor. After a thorough review of the parties' briefs and the extensive record, and with the benefit of oral argument, we affirm. We write on one of the issues relevant to GSRG's attempted monopolization claim, in order to explain why cross-elasticity of supply is critical to defining the relevant market in this case.  On all other issues raised by GSRG, we affirm based on the special master's reports and the district

2

court's order.

## I

Because the special master and the district court catalogued the relevant facts, we set out only those that are necessary for our discussion. Where the facts are disputed, we of course view the evidence in the light most favorable to GSRG. *See, e.g., Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).

## A

Depending on how it is processed and cooled, steel can have a variety of forms. One popular type of steel, black hot rolled coil steel, is a form of plain black sheet steel which is rolled into a coil for ease of storage, handling, and transportation. When new black hot rolled coil steel is bathed in acid and coated with oil, the resulting type of steel is called pickled and oiled steel.[1]

Nucor is a leading manufacturer of black hot rolled coil steel. In 1999, Gulf States Steel, one of Nucor's main competitors in the Southeast—a region that GSRG defines as Alabama, Arkansas, Florida, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, Tennessee, and Texas—filed for bankruptcy under Chapter 11. In 2000, after reorganization proved unsuccessful, the bankruptcy

---

[1] As described by some courts, the "pickling" process removes rust and scale and makes the surface of the steel white. *See Crucible Steel Co. v. United States*, 132 F. 269, 270 (C.C.N.Y. 1904); *Ohio Steel Tube Co. v. Limbach*, 1987 WL 14301, *2 (Ohio Ct. App. 1987).

3

court converted the Chapter 11 case into a Chapter 7 liquidation proceeding. This conversion meant that the assets of Gulf States Steel—including a steel plant in Gadsden, Alabama—would be sold.

GSRG, a newly-formed entity, wanted to enter the black hot rolled coil steel market by purchasing the assets of Gulf States Steel, and it decided to bid for those assets at a bankruptcy auction. According to GSRG's internal analysis, these assets had a book value of at least $13.3 million.

**B**

At a bankruptcy auction held in May of 2001, GSRG purchased the non-steel-producing assets of Gulf States Steel for almost $2 million. The steel-producing assets of Gulf States Steel, however, went unsold because no one met the reserve price of $7.1 million.

In early July of 2002, GSRG signed a contract with the bankruptcy trustee to purchase the steel-producing assets for $5 million unless another party submitted a higher bid, in which case there would be a second public auction. When Nucor found out about GSRG's contract with the trustee, it executed a confidential agreement (through its acquisition entity, Stenroh, Inc.) with Casey, an entity which buys used steel-related equipment (for resale to steel manufacturers) and develops industrial parks (i.e., areas zoned for industrial development).

4

The agreement between Nucor and Casey essentially required the two entities to form a limited liability company, Gadsden Industrial Park, LLC. Pursuant to the agreement, Park could bid up to $8 million, a sum which Nucor would loan on a non-recourse basis, to buy the steel-producing assets of Gulf States Steel. If Park won the auction, Casey would then sell the assets, pay 75% of the proceeds to Nucor, and keep the remaining 25%. Casey would also be allowed to recover the substantial costs of dismantling and loading the plant and the steel-producing assets. Nucor could reject any sale to any domestic third-party purchasers, and all other sales were subject to Nucor's "reasonable approval." According to GSRG, the agreement gave Casey a far higher remuneration than the average commission for such transactions.

On September 12, 2002, Park bid $5.25 million for the steel-producing assets, thereby triggering a second public auction. That auction was held four days later, and this time Park bid $6.3 million in cash. GSRG bid $7 million, but its bid did not conform with the auction's rules because it included forgiveness of the bankruptcy estate's debt to GSRG. As a result, GSRG's bid was rejected. Although GSRG was given another opportunity to submit a bid that conformed with the auction's rules—and had the cash to make a conforming bid—it chose not to do so. Park's cash bid of $6.3 million therefore won the day. The bankruptcy court later

5

rejected GSRG's challenge to the result of the auction.

After the auction, Casey sold the steel-producing assets to an Asian buyer for $18 million (net of dismantling and loading costs, which totaled $9 million). Park kept the bankruptcy estate's land and transformed it into an industrial park. In the end, Casey and Nucor made a total profit of almost $12 million from the sale of the assets.

GSRG sued Nucor, Casey, and Park, alleging that they contracted and combined to purchase the steel-producing assets of Gulf States Steel in order to block competition in the black hot rolled coil steel market, in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. GSRG also alleged that, through its actions, Nucor created a dangerous probability that it would obtain monopoly power over the black hot rolled coil steel market in the Southeast, which, if true, would constitute an attempt to monopolize in violation of § 2 of the Sherman Act, 15 U.S.C. § 2. Finally, GSRG alleged that Nucor, Casey, and Park conspired to monopolize that same market, in violation of § 2.[2]

## II

The Sherman Act, among other things, outlaws the "attempt to monopolize .

---

[2] GSRG, in the words of the district court, "resolved [its] differences" with Casey and Park. *See Nucor Corp.*, 822 F. Supp. 2d at 1219 n.17.  We therefore have no occasion to address any of the claims GSRG asserted against Casey and Park.

. . any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. As defined by the Supreme Court, "[t]he phrase 'attempt to monopolize' means the employment of methods, means and practices which would, if successful, accomplish monopolization, and which, though falling short, nevertheless approach so close as to create a dangerous probability of it[.]" *Am. Tobacco Co. v. United States*, 328 U.S. 781, 785 (1946). Thus, to establish a violation of § 2 for attempted monopolization, "a plaintiff must show (1) an intent to bring about a monopoly and (2) a dangerous probability of success." *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1555 (11th Cir. 1996) (internal quotation marks omitted).

A dangerous probability of success arises when the defendant comes close to achieving monopoly power in the relevant market. *See id. See also Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993) ("We hold that petitioners may not be liable for attempted monopolization under § 2 of the Sherman Act absent proof of a dangerous probability that they would monopolize a particular market and specific intent to monopolize."). A plaintiff can show this dangerous probability of success only if it can properly define the relevant market, which has both product and geographic dimensions. *See T. Harris Young & Assocs. v. Marquette Elecs.*, 931 F.2d 816, 823 (11th Cir. 1991).

7

GSRG's proposed relevant product market—black hot rolled coil steel—did not account for the fact that manufacturers of pickled and oiled steel could, without much difficulty or cost, switch their production to that of black hot rolled coil steel. Therefore, the district court reasoned, GSRG did not define a proper product market. *See Nucor Corp.,* 822 F. Supp. 2d at 1235-36. We agree with the district court's analysis.

Key to comprising a relevant market, a product market is defined in part by whether a group of manufacturers, "because of the similarity of their products, have the ability—actual or potential—to take significant amounts of business away from each other." *U.S. Anchor Mfg. v. Rule Indus.*, 7 F.3d 986, 995 (11th Cir. 1993). GSRG steadfastly asserts that pickled and oiled steel is not the equivalent of black hot rolled coil steel from the perspective of purchasers, but this assertion misses the point. *See, e.g., Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1436 (9th Cir. 1995) ("[D]efining a market on the basis of demand considerations alone is erroneous. A reasonable market definition must also be based on 'supply elasticity.'") (internal citation omitted).

One way to decide if producers or manufacturers can take business away from a monopolist (or an attempted monopolist) is to analyze the concept of cross-elasticity of supply, which "looks at competition from the production end instead

8

of the consumer end." *Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d 256, 280 n.79 (5th Cir. 1978).  *See also Brown Shoe Co. v. United States*, 370 U.S. 294, 325 n.42 (1962) ("The cross-elasticity of production facilities may also be an important factor in defining a product market . . . .").  The black hot rolled coil steel market, we conclude, has a high cross-elasticity of supply.

Picked and oiled steel is essentially black hot rolled coil steel that a manufacturer bathes in acid and coats with oil. A pickled and oiled steel manufacturer necessarily produces black hot rolled coil steel and can, without much or any cost (and maybe even at less cost), switch and produce black hot rolled coil steel.  That equates to a high cross-elasticity of supply, and a "[h]igh cross-elasticit[y] of supply . . . deter[s] monopoly pricing." *Spectrofuge Corp.*, 575 F.2d at 280 n.79. As we explained in *Spectrofuge Corp.*, a "'very high cross-elasticity of supply is a way of describing a condition in which the cost and rapidity of new entry are such that a monopolist of the product would have negligible power to increase its price above the competitive level. The increase would evoke a prompt and substantial increase in the output of the product, as manufacturers of other products switched to production of his product.'" *Id.*

(quoting RICHARD POSNER, ANTITRUST 441 (1974)).[3]

Assume, for example, that Nucor obtains a monopoly of the black hot rolled coil steel market. Through its monopoly, Nucor inflates prices (by, say, lowering the supply of black hot rolled coil steel, which, given a constant demand, increases the price). Such a move would present pickled and oiled steel manufacturers with two options. They could continue to produce pickled and oiled steel at the same cost and continue to sell that product at the same price. Or they could cut the "pickling" processing short (thereby saving the costs of converting black hot rolled coil steel into pickled and oiled steel) and sell the black hot rolled coil steel at the higher price to earn significant profits. In a world of rational economic actors, *see U.S. Anchor Mfg.,* 7 F.3d at 997, one would expect that many, if not all, of these manufacturers would choose the latter course. As the district court explained, "[p]roducers of pickled and oiled hot rolled coil [steel] already have the appropriate substitute product by simply foregoing the one additional process

---

[3] Although *Spectrofuge Corp.* is now 35 years old, its articulation of the concept of cross-elasticity of supply remains sound. *See* JULIAN VON KALINOWSKI ET AL., 2 ANTITRUST LAWS AND TRADE REGULATION § 24.02[1][c], at 24-55 (2d ed. 2012) ("Another important factor in defining a product market is the ability of existing companies to alter their facilities to produce the defendant's product. The Supreme Court has long recognized the significance of this factor, often referred to as cross-elasticity of supply.") (footnote omitted); PHILLIP AREEDA, HERBERT HOVENKAMP, & JOHN SOLOW, IIB ANTITRUST LAW ¶ 561, at 360 (3d ed. 2007) ("[I]f *B* producers can costlessly switch production to product *A* in a short time and can readily distribute the resulting output, they will constrain the prices of *A* firms in virtually the same way as another *A* firm.").

required to produce the pickled and oiled product." *Nucor Corp.,* 822 F. Supp. 2d at 1236.

GSRG argues that the record is devoid of evidence to support the district court's analysis as to cross-elasticity of supply, but it is mistaken. One of Nucor's experts expressly opined that there was high cross-elasticity of supply between black hot rolled coil steel and pickled and oiled steel, and one of GSRG's own experts conceded that, all things being equal, manufacturers of pickled and oiled steel would produce black hot rolled coil steel if the latter product was selling at a higher price. *See, e.g.,* Report of Nucor's Expert, Dr. Seth Kaplan, at 5 ("If black bands become more profitable than processed downstream steel products, producers will cease processing black band and sell the band on the commercial market."); Deposition of GSRG's Expert, Dr. Michael Locker, at 61 ("Q: And if the price of black were to change so that you could make more profit on black than you could on, say, a pickled and oiled product, there is nothing that would prevent the mill from saying, I'm just going to sell more black and cut back on producing pickled and oiled, correct? A: As long as they could satisfy their customer base that had been established and they wanted to retain, in black."). GSRG simply did not present evidence to create an issue of material fact with respect to the cross-

elasticity of supply.[4]

In sum, GSRG's definition of the product market is too restrictive, for it refuses to acknowledge that pickled and oiled steel manufacturers could (and likely would) enter the fray in order to enrich themselves on the inflated prices of black hot rolled coil steel. That would, in turn, increase the supply, and lower the price, of black hot rolled coil steel. It would also sap Nucor's potential monopoly power. GSRG ignores this "actual or potential" economic construct, *U.S. Anchor Mfg.,* 7 F.3d at 995, and its failure to account for cross-elasticity of supply is fatal to the attempted monopolization claim under § 2.

## III

We affirm the district court's grant of summary judgment in favor of Nucor.

**AFFIRMED.**

---

[4] We do not mean to suggest that companies always act to maximize profits in the short term. Indeed, conduct that appears unprofitable—such as a dominant player flooding the market with its product in order to bring prices down—may actually be rational and profit maximizing because it is part of a large and/or long-term anticompetitive scheme to drive competitors from the market or enforce cartel discipline. *See, e.g.,* Christopher Leslie, *Rationality Analysis in Antitrust,* 158 U. PA. L. REV. 261, 273, 274-85, 327-28 (2010).